STATE OF NORTH CAROLINA v. JAMES HENRY SMITH.

(Filed 14 December, 1966.)

**1. Homicide § 20—**
    Where the evidence tends to show that deceased died from a wound defendant intentionally inflicted with a pistol, defendant's motions for nonsuit are properly denied.

**2. Homicide §§ 9, 20—**
    The credibility and sufficiency of defendant's evidence to establish his plea of self-defense are for the jury to evaluate under proper instructions from the court, and cannot warrant nonsuit.

**3. Criminal Law § 139—**
    The verdict of the jury upon supporting evidence is conclusive in the absence of error of law in the trial.

**4. Jury § 6—**
    Where, upon an indictment charging homicide, the solicitor announces that he is not seeking a higher verdict than murder in the second degree, the prosecution is no longer for a capital offense, and it is not required that the jury be again sworn to try the particular prosecution, but under the provisions of G.S. 11-11 it is sufficient that the jurors and all others summoned as jurors for the session of court were administered oath to truly try all issues which should come before the jury during the term.

APPEAL by defendant from *Carr, J.,* April 25, 1966 Criminal Session of HOKE.

Defendant, James Henry Smith, was indicted for the first-degree murder of Arthur Burroughs Rabon on December 28, 1965. When the case was called for trial, the solicitor announced that he would not seek a higher verdict than murder in the second degree.

Evidence for the State tended to show: The deceased (Rabon, Sr.) and defendant's father were first cousins. The deceased was an elderly man with white hair; defendant was 32 years old. Deceased's daughter, Helen, had been living in the home of defendant and his wife for the past two years. In January 1965, she had given birth to an illegitimate child, which — deceased thought — defendant had fathered. As a result, there was bad blood between defendant and the Rabon family. On the morning of the shooting, Robert Rabon, a son of deceased, had been convicted of assaulting defendant. The Rabon family had attended the trial. After it was over, decedent's son, Arthur Burroughs Rabon, Jr. (Rabon, Jr.), took Rabon, Sr., to his home on Highway No. 211 preparatory to a trip to Greensboro. While Rabon, Jr., sat in the car waiting for his father to come out, defendant passed by. Three of his children, along with Helen Rabon and her child, were in the car with him. Rabon, Sr., emerged about that time and they "pulled out to Greensboro on Highway 211."

Rabon, Jr., overtook defendant's car and passed it at a speed of about 70 MPH. He then slowed down and defendant passed him. As defendant passed, he pointed a pistol at the occupants of the Rabon car. Rabon, Jr., made no further attempt to pass defendant. About 10 miles from the Rabon home, with his tires squealing, defendant drove off the highway into Wilson's Shell Service Station. He appeared to the occupants of the station to be frightened and he hollered, "Call the law," but no one called. Rabon, Jr., testified that he pulled in and stopped 4-5 feet behind defendant's vehicle so that his father could call the sheriff. Neither Rabon, Sr., nor his son was armed. When Rabon, Sr., got out of the automobile, defendant got out of his car, stood at the door, and started shooting. After the first shot, Rabon, Sr., grabbed his arms and defendant shot again. Deceased had not moved from the spot at which he was shot the first time.

When deceased fell, Rabon, Jr., opened the door of his car and started to get out. Defendant said, "Burroughs, if you get out, I will shoot you too." Seeing the pistol in defendant's hand, Rabon, Jr., "ducked back in the seat." Defendant fired, and the bullet made a hole in the windshield over the steering wheel. Rabon, Jr., "peeped out" and defendant told him to get out where he could see him; that he wanted to kill him too. Defendant added, "You didn't think I was going to do it." Rabon, Jr., still crouched, backed his car out into the street where he sat until the officers arrived approximately 20 minutes later. During that time he watched defendant drink a soft drink. Immediately after the shooting, defendant said to a bystander, "I'll swan, I sure hated to kill that old man but he would have killed me." Several months earlier, defendant, referring to deceased, had said that "he would get the white-headed rascal sooner or later."

Defendant's evidence tended to show: On the morning of the shooting, defendant had requested the Chief of Police of Raeford to protect him from the Rabons. Because he was afraid to go alone, he had asked the Chief to accompany him to the courthouse where he was to appear as a witness against Robert Rabon, whom he had charged with assault. The Chief stayed near him until after the trial when he "told him to pick up his children and get out of town." Defendant was following this advice when the Rabon car came up behind him on Highway No. 211 at a high rate of speed. Defendant slowed down in the hope that the Rabons would pass him. They slowed down too, however, and followed him so closely that the two cars were traveling bumper to bumper. Defendant then tried to outrun the Rabon automobile, but they pursued him at a speed of 85-90 MPH. Once, when the Rabon car came alongside defendant's

automobile, Rabon, Sr., pointed his finger at defendant and said, "Boy, I am going to get you yet." In July or August, Rabon, Sr., had threatened defendant's life, saying, *inter alia,* that he was a better man than defendant and that he settled his disputes rather than let the law settle them for him.

Defendant denied that he ever drew a pistol on the Rabons until he went into the service station. He testified that when they came in, Rabon, Sr., opened the car door on his side and said, "You've had it." At the same time, Rabon, Jr., was attempting to get out of the automobile on his side. Defendant hollered for help and for someone to get the law. When nobody answered, he thought the service station was deserted. He told Rabon, Sr., to go on and leave him alone. Instead of doing so, however, he came on him and defendant shot him because, he said, Rabon, Sr., would have killed him had he not done so. He then shot at Rabon, Jr., to keep him from jumping out of the car and attacking him. He never saw any weapon of any kind in the hands of either Rabon, Jr., or Rabon, Sr., on that day. On an earlier occasion, however, he had seen Rabon, Jr., with a pistol. After the shooting defendant stayed at the station, with his pistol in his hand, until the officers arrived. When he drank a soft drink, he continued to hold the pistol in his hand.

A maid, Lula Bell Purcell, who worked at the house across the street from the Wilson Service Station, was cleaning some rugs on the front porch when defendant's automobile and the Rabon vehicle came into the service station. She testified that the Rabon car "was chasing" defendant's car; that the man in the rear car had a pistol; and that he was shooting when the two cars drove up. She went into the house and locked the door. No other witness put a weapon in the possession of the Rabons.

The jury returned a verdict of guilty of murder in the second degree. From a judgment that defendant be confined in the State's prison for not less than twelve nor more than fifteen years, defendant appeals.

*T. W. Bruton, Attorney General; Andrew A. Vanore, Jr., Staff Attorney for the State.*

*Egerton, Alspaugh & Rivenbark by Laurence Egerton, Jr., and W. Douglas Albright for defendant.*

SHARP, J. Both the State's and defendant's evidence tended to show that deceased died from a wound which defendant intentionally inflicted with a pistol. Defendant's motions for nonsuit were, therefore, properly denied. *State v. Redfern,* 246 N.C. 293, 98 S.E. 2d 322; *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322; 2 Strong, N. C.

Index, Homicide § 20 (1959). The credibility and sufficiency of defendant's evidence to establish his plea of self-defense were for the jury to evaluate in the light of the court's instructions. The judge's charge embraced all the applicable principles of law relating to self-defense, *State v. Marshall,* 208 N.C. 127, 179 S.E. 427, and it fairly presented all of appellant's contentions. Defendant was unable to satisfy the jurors, who heard him and his witness testify and observed their demeanor, that the homicide was excusable. Under the evidence, the jury might well have returned a different verdict. Defendant's guilt or innocence, however, could only be determined by the twelve, and their verdict must stand unless some error of law appears in the trial.

In a last-ditch effort to escape the verdict, defendant now contends — for the first time — that it is invalid because the jurors were not sworn to try this particular case after they had been selected and impaneled for it. At the beginning of the term, however, the Clerk of the Superior Court had administered to the individual jurors who tried this case, and to all others who had been summoned as jurors for that week of the Session, the following oath, which G.S. 11-11 prescribes for the "jury, in criminal actions not capital":

> "You and each of you swear (or affirm) that you will well and truly try all issues in criminal actions which shall come before you during this term, and true verdicts give according to the evidence thereon; so help you God. (The same oath to talesmen by using the word 'day' instead of 'term'.)"

For the "jury, in a capital case," G.S. 11-11 prescribes a specific oath which must be administered to each juror before he is seated on the panel to try the case. Defendant here was indicted for a capital crime, but when the solicitor announced to the court as the case was called for trial that the State would not seek a verdict of murder in the first degree, the case became a "criminal action not capital." It was after this announcement that defendant entered his plea and the jury was selected.

Defendant correctly asserts that under the common law it was essential "that the jury be duly sworn to try *the cause.*" 31 Am. Jur., Jury § 242 (1958). (Emphasis added.) See also 50 C.J.S., Juries § 294 (1947). Where, however, the statute so provides, a general oath may be administered to jurors at the opening of a court for the trial of issues, and it is not necessary that they should be sworn in each cause in which they are called. *The People, on the relation of Wands, vs. Albany C. P.,* 6 Wend. (N.Y.) 548; 31 Am. Jur., Jury § 242, *supra.*

In North Carolina, the common-law requirement that jurors be sworn to try the cause was changed with reference to civil cases "At a General Assembly, begun and held at Fayetteville on the First Day of November, in the Year of our Lord, One Thousand Seven Hundred and Ninety, and in the Fifteenth Year of the Independence of the said State: Being the First Session of the said Assembly." Preamble to the Laws of North Carolina (1790). Chapter IX of these Laws provided:

"WHEREAS the present method practised in the courts of law in this state of swearing the petit jury in every cause, in some measure retards the business in said Courts, and such frequent use of oaths in a great measure destroys their solemnity:

"I. *Be it therefore enacted by the General Assembly of the State of* North Carolina, *and it is hereby enacted by the authority of the same,* That from and after the first day of June next, the clerks of the respective courts of law, shall at the beginning of their courts, swear or cause to affirm such of the petit jury as are of the original pannel, well and truly to try all civil causes that shall come before them according to the evidence given thereon, and if there should not be enough of the original pannel, talismen shall take a similar oath or affirmation to try such causes as shall come before them during the day. *Provided always* . . . that nothing herein contained shall be construed to alter the present method of swearing petit jurors on state trials, but the same shall continue in the usual form as heretofore practised."

In Taylor's Revisal of 1827, Chapter 1133, it was enacted,

"That in the trial of all pleas and prosecutions for offences not capital, unless in cases where the courts may otherwise direct, petit jurors, as well (as) talismen, as those of the original pannel, shall be sworn or affirmed, (as the case may be,) well and truly to try all issues of traverse, that shall come before them *during the day.*" (Italics ours.)

Thus, instead of swearing jurors in *every criminal case,* in 1827 they were sworn only *once a day.* In the Revised Code of North Carolina, enacted by the General Assembly of 1854, Chapter 76 (30), we find the same oath provided for "criminal cases not capital" which is now incorporated in G.S. 11-11. Thus, in 1854, the "method of swearing petit jurors on State trials" other than capital (which the General Assembly of 1790 had refused to alter when it changed the method of swearing jurors in civil actions) became the same as

that prescribed in civil trials. Since 1827 the statute — not the common law — has governed the procedure in cases such as this.

The method employed by the Clerk of the Superior Court in swearing the jurors who tried this case has had the sanction of the law for more than one hundred years. We have known of no other procedure in our lifetime.

In the trial below, we find

No error.