STATE OF NORTH CAROLINA v. TIMOTHY BAILY HENNIS

No. 499A86

(Filed 6 October 1988)

**1. Homicide § 20.1— photographs of homicide victim**

Properly authenticated photographs of a homicide victim may be introduced into evidence under the trial court's instructions that their use is to be limited to illustrating a witness's testimony. Thus, photographs of the victim's body may be used to illustrate testimony as to the cause of death and to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree.

**2. Homicide § 20.1— photographs of victim's body—effect of gruesomeness**

Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitive use is not aimed solely at arousing the passions of the jury.

**3. Homicide § 20.1— prejudicial effect of photographs—discretion of court**

Whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each lies within the discretion of the trial court, and abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. N.C.G.S. § 8C-1, Rule 403.

**4. Homicide § 20.1— admission of photographs—factors for consideration by the court**

In determining the illustrative value of photographic evidence and in weighing its use by the State against its tendency to prejudice the jury, the

trial court must consider what the photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, and the scope and clarity of the testimony it accompanies. In addition, the trial court must probe the relevance of the scene depicted and conclude that its irrelevant portions do not obscure those elements that are pertinent to the proffered testimony and must determine that the photograph does not unduly reiterate illustrative evidence already presented.

**5. Homicide § 20.1— excessive and repetitious crime scene and autopsy photographs—manner of presentation—prejudice to defendant**

In a prosecution for first degree murders of a mother and two of her children by stabbing and cutting them, the trial court abused its discretion in the admission for illustrative purposes of nine photographs of the victims' bodies taken at the crime scene and twenty-six photographs of the bodies taken at the autopsy where many photographs with repetitious content were admitted, and where the majority of the twenty-six autopsy photographs added nothing to the State's case as already delineated in the crime scene photographs and their accompanying testimony. Furthermore, the prejudicial effect of the repetitious photographs was compounded by the manner in which the photographs were presented where duplicate slides of the photographs were shown on an unusually large screen on a wall directly over defendant's head such that the jury continually had defendant in its vision as it viewed the slides, and where the thirty-five photographs were slowly and silently distributed to the jury one at a time just before the State rested its case.

Justice MITCHELL dissenting.

Justice MEYER joins in this dissenting opinion.

APPEAL by defendant from judgments sentencing him to death for three convictions of murder in the first degree and to life imprisonment for conviction of rape in the first degree, said judgments imposed by *Johnson, J.*, at the 26 May 1986 session of Superior Court, CUMBERLAND County. Heard in the Supreme Court 14 September 1988.

*Lacy H. Thornburg, Attorney General, by William N. Farrell, Jr., and Joan H. Byers, Special Deputy Attorneys General, for the state.*

*H. Gerald Beaver, William O. Richardson, F. Thomas Holt III, and Ann B. Petersen for the defendant.*

MARTIN, Justice.

Among the numerous assignments of error identified and argued before us by defendant, one particularly merits our scrutiny

and discussion: the use of photographs and slides of the victims' bodies to illustrate the testimony of witnesses for the state.

We only find it necessary to summarize the evidence with respect to the dispositive issue on this appeal. Shortly after noon on Sunday, 12 May 1985, neighbors concerned that they had not seen Kathryn Eastburn or her three children since Thursday night fruitlessly rang the doorbell and knocked on several doors to the Eastburn home. The failure of Mrs. Eastburn to come to the door and the sound of what they thought was a baby's cry prompted the neighbors to call the sheriff's department. The deputy sheriff who responded to their call repeated their attempts to arouse inhabitants and, in circling the house to find an open door or window, saw a child inside standing in her crib. He cut the screen on the window and entered the house, passing the child out to a waiting neighbor.

The officer opened the door to the hall and walked through the house to the master bedroom where he discovered the body of three-year-old Erin Eastburn and the naked body of her mother on the floor. The officer noted that there were numerous knife wounds to the chests of both victims and that part of the child's face and chest and Mrs. Eastburn's face were covered with pillows. On the bed in a second bedroom the officer found the body of five-year-old Kara Eastburn, also with numerous knife wounds to her chest and side and a pillow or blanket over her head.

Autopsies of the three victims revealed that the cause of death of all three had been stab wounds and a large cut in the neck of each. The autopsies also revealed bruising and abrasions and "defensive type" wounds to the hands and forearms of one or more of the victims. In addition, Mrs. Eastburn's wrists showed marks consistent with their having been tied, and vaginal swabs revealed the presence of sperm deposited within hours of her death.

Evidence linking defendant to the crime was chiefly circumstantial. Despite the fact that investigators examining the Eastburn home discovered fingerprints and one Caucasian pubic hair that belonged to none of the Eastburn family members, these and the analysis of bloodstains and of the sperm from Mrs. Eastburn's vagina failed to reveal any match with defendant's physical characteristics. The only direct evidence implicating defendant

was the testimony of a neighbor who had been walking by the Eastburn house at 3:30 a.m. on Friday morning, and who saw a man he later identified as defendant walking down the Eastburn's driveway and toting a plastic garbage sack. The tenuousness of this identification was apparent in that the witness revised his impression of the stature and build of the man he said he had seen from one shorter and slighter than himself to one of defendant's build—one considerably taller and heavier than the witness's own.

A second witness testified that she had seen a man who looked like defendant getting into a small light-colored car in the vicinity of the bank where Mrs. Eastburn's bank card had been used Saturday morning, 11 May. This witness's identification of defendant was extremely tentative, however: when asked by investigators in late June or early July whether she had seen anyone near the bank that Saturday morning, she had replied that she "had not seen anyone." It wasn't until the following April that she recalled having seen anyone, and when she picked defendant's photograph out of a lineup, she admitted that she was not sure whether she was identifying him from the newspapers or from seeing him at the bank that morning.

The state made ninety-nine photographs of the crime scene and of the bodies at the autopsy. These were subjected to a pretrial motion filed by defendant requesting that the use of the photographs of the victims be prohibited, or, in the alternative, that it be restricted to one photograph per victim, and that the trial court review the state's intended use of the photographs with an eye to possible excess. Pursuant to the motion, the trial court reviewed the photographs and concluded that thirty-five crime scene and autopsy photographs could be offered at trial.

The state made duplicate slides of the thirty-five acceptable photographs and the trial court subsequently authorized the construction of a screen large enough to project two images 3 feet 10 inches by 5 feet 6 inches side-by-side on the courtroom wall opposite the jury. This design permitted the jury to view the slides projected just above defendant's head.

Nine slides depicting the victims' bodies at the crime scene were used to illustrate the testimony of the deputy sheriff who discovered the bodies and of the paramedic who arrived shortly

afterwards. Despite the fact that defendant had signed stipulations as to the cause of the victims' deaths that tracked the autopsy reports, twenty-six slides of the bodies taken at the autopsy were used by forensic pathologists to illustrate their testimony as to the nature and extent of the wounds.

The thirty-five 8-by-10-inch glossy photographs, the majority of which were in color, were subsequently distributed, one at a time, to the jury. This process took a full hour and was unaccompanied by further testimony. The autopsy photographs generally depicted the head and chest areas of the victims and revealed in potent detail the severity of their wounds, made all the more gruesome by the visible protrusion of organs, caused by process of decomposition. The trial court's charge to the jury shortly before it retired to consider its verdicts included the admonition that the photographs and other illustrative evidence were to be used "for the purpose of illustrating and explaining the testimony of the various witnesses. . . . [and that they were not to] be considered . . . for any other purpose."

Defendant asserts that the state's use of slides and photographs of the victims' bodies addressed and impressed the emotions of the jury more forcefully than its logic and that, because the probative value of such evidence was far outweighed by its prejudicial impact, he was deprived of a fair trial.

[1, 2] The admissibility of evidence, including photographic evidence, is governed by Rule 403 of the North Carolina Rules of Evidence, which states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1986). "Unfair prejudice" means an undue tendency to suggest a decision on an improper basis, usually an emotional one. *State v. Mason*, 315 N.C. 724, 340 S.E. 2d 430 (1986). Photographs are usually competent to explain or illustrate anything that is competent for a witness to describe in words, *State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 935 (1988), and properly authenticated

photographs of a homicide victim may be introduced into evidence under the trial court's instructions that their use is to be limited to illustrating the witness's testimony. *Id.; State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448 (1984). Thus, photographs of the victim's body may be used to illustrate testimony as to the cause of death, *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). Photographs may also be introduced in a murder trial to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree, *State v. Lester*, 294 N.C. 220, 240 S.E. 2d 391 (1978), and for this reason such evidence is not precluded by a defendant's stipulation as to the cause of death. *State v. Elkerson*, 304 N.C. 658, 285 S.E. 2d 784 (1982). Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury. *State v. Murphy*, 321 N.C. 738, 365 S.E. 2d 615 (1988); *State v. King*, 299 N.C. 707, 264 S.E. 2d 40 (1980).

This Court has recognized, however, that when the use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury. Thus, this Court has concluded that photographs taken in the funeral home of a murder victim's body were "poignant and inflammatory" where the evidence tended to show that the victim had been lying on a bed when shot and when the evidence as to the cause of his death was uncontradicted. *State v. Mercer*, 275 N.C. 108, 121, 165 S.E. 2d 328, 337 (1969), *overruled on other grounds, State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975).

And this Court has repeatedly warned against the redundant or excessive use of photographs of victims' bodies:

But where a prejudicial photograph is relevant, competent and therefore admissible, the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors.

*State v. Mercer*, 275 N.C. 108, 120, 165 S.E. 2d 328, 337, *quoted in State v. Johnson*, 298 N.C. 355, 377, 259 S.E. 2d 752, 765 (1979). *See also State v. Sledge*, 297 N.C. 227, 231-32, 254 S.E. 2d 579, 583 (1979) (despite finding no prejudicial error, the Court admonished the state that it "likely could have illustrated the medical testimony fully as well with fewer pictures. Excessive use of photographs is not favored.").

[3]   In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion. *State v. McLaughlin*, 323 N.C. 68, 372 S.E. 2d 49 (1988); *State v. Mason*, 315 N.C. 724, 340 S.E. 2d 430. Whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each likewise lies within the discretion of the trial court. *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579. Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. *State v. Parker*, 315 N.C. 249, 337 S.E. 2d 497 (1985).

[4]   The test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. The trial court's task is rather to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation. What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies—these are all factors the trial court must examine in determining the illustrative value of photographic evidence and in weighing its use by the state against its tendency to prejudice the jury. *See State v. Banks*, 564 S.W. 2d 947 (Tenn. 1978). In addition, the trial court must probe the relevance of the scene depicted and conclude that its irrelevant portions do not obscure those elements that are pertinent to the proffered testimony. *See, e.g., State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (where there was no evidence that the defendant had mutilated or dismembered the body of the deceased, photographs of the victim's body after its having been ravaged by animals not probative of any material fact at issue); *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (funeral home photographs).

Finally, critical to the trial court's inquiry into the admissibility of a photograph is the determination that it does not unduly reiterate illustrative evidence already presented. When a photograph "add[s] nothing to the State's case," *State v. Temple*, 302 N.C. 1, 14, 273 S.E. 2d 273, 281 (1981), then its probative value is nil, and nothing remains but its tendency to prejudice.

[5] In spite of the trial court's appropriate determination that many of the photographs initially proffered by the state were repetitious and the court's consequential ruling that these could not be admitted into evidence, many other photographs with repetitive content were allowed. The record reflects such repetition even in the testimony of one of the pathologists, who at one point had nothing to say concerning a slide depicting a child's neck wound except to identify it and add, "This looks like the one we saw before." Likewise, the several color images of the same victim's neck wound taken at the autopsy cannot be said to have added anything in the way of probative value to the color images of that same wound taken at the crime scene and projected before the jury in illustration of the previous testimony, even when the witness was testifying to different facts. Although this Court has not disapproved the illustrative use of autopsy photographs, *e.g.*, *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579, the majority of the twenty-six photographs taken at the victims' autopsies here added nothing to the state's case as already delineated in the crime scene slides and their accompanying testimony. Given this absence of additional probative value, these photographs—grotesque and macabre in and of themselves—had potential only for inflaming the jurors. *State v. Murphy*, 321 N.C. 738, 365 S.E. 2d 615.

In addition, the prejudicial effect of photographs used repetitiously in this case was compounded by the manner in which the photographs were presented. The erection of an unusually large screen on a wall directly over defendant's head such that the jury would continually have him in its vision as it viewed the slides was a manner of presentation that in itself quite probably enhanced the prejudicial impact of the slides themselves. Finally, the thirty-five duplicative photographs published to the jury one at a time just before the state rested its case were excessive in both their redundancy and in the slow, silent manner of their presentation. We hold that under the facts of this case, permit-

ting the photographs with redundant content to be admitted into evidence and to be twice published to the jury was error.

Only upon a showing that the trial court erred and that defendant has been prejudiced thereby will defendant be granted a new trial. In *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752, and in *State v. Temple*, 302 N.C. 1, 273 S.E. 2d 273, the unnecessary or repetitive use of photographic evidence was held to be harmless where the evidence of defendant's guilt was overwhelming. This is not such a case. Here defendant was linked to the crime through circumstantial evidence and through direct evidence upon which the witnesses' own remarks cast considerable doubt. Overwhelming evidence of his guilt was not presented. He was nonetheless found guilty and sentenced to death. Under N.C.G.S. § 15A-1443(a) (1983), reversible error occurs when the defendant shows "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *Id.* In view of the verdicts and sentences handed down in defendant's trial, it cannot be said that this error, which tended to inflame the passions of the jury, was not prejudicial. We accordingly hold that defendant is entitled to a new trial. Defendant brings forward and argues many additional assignments of error, both as to the guilt phase and the sentencing phase of this trial. However, in view of our disposition of this appeal, we do not find it necessary to address defendant's remaining assignments of error, confident that such alleged errors are not likely to recur upon retrial.

New trial.

Justice MITCHELL dissenting.

In my view, the majority correctly states in detail the rules of law concerning the admissibility of photographs for illustrative purposes and then proceeds to misapply them. Therefore, I am unable to join in the majority's conclusion that the trial court abused its discretion in permitting the introduction of slides and photographs for illustrative purposes in the present case. Accordingly, I dissent from the majority's decision to award the defendant a new trial.

As I do not find the State's evidence nearly so weak nor the eyewitness identification testimony nearly so "tenuous" as does

the majority, a brief review of what *some* of the evidence for the State tended to show is perhaps in order at the outset. In May 1985, Kathryn Jean Eastburn and her husband Gary Eastburn, a Captain in the United States Air Force, lived in Cumberland County with their three children: five-year-old Kara, three-year-old Erin and twenty-month-old Jana. On the evening of Thursday, 9 May 1985, Mrs. Eastburn left Kara asleep in the home and went to a neighbor's with Erin and Jana to borrow some milk for the children's breakfast. Mrs. Eastburn and the two children left the neighbor's house at approximately 8:00 p.m. and returned home. Mrs. Eastburn, Kara and Erin were not seen again alive.

When Captain Eastburn made his customary Saturday telephone call to his family on the morning of Saturday, 11 May 1985, he received no answer and became alarmed. As a result of further telephone calls by Captain Eastburn, various law enforcement and military personnel went to the home from time to time on Saturday and Sunday, but no one answered the door or responded to a note left for Mrs. Eastburn to call her husband. Law enforcement officers entered the home shortly after noon on Sunday, 12 May 1985, and found Mrs. Eastburn, Kara and Erin dead. Each had been stabbed numerous times and had had her throat cut. The baby Jana was in her crib unharmed. Copies of the local newspaper for Friday, 10 May 1985, Saturday, 11 May 1985, and Sunday, 12 May 1985, were found on the front lawn of the home. The newspaper for Thursday, 9 May 1985, was found inside the home.

At approximately 3:30 a.m. on Friday, 10 May 1985, Patrick Cone was walking past the driveway to the Eastburn home. He saw a man he positively identified as the defendant walking down the driveway from the direction of the home wearing a toboggan cap and black jacket and carrying a plastic garbage bag over his right shoulder. The defendant passed within a few feet of Cone and said to Cone: "leaving a little early this morning."

Later that morning, Cone told his father what he had seen and pointed out the Eastburn house to his father as the two men went to work. When Cone arrived at work, he told others what he had seen.

Cone's father testified that Cone had come home around 4:00 a.m. When they left for work, Cone pointed out the Eastburn house and told his father that it was the house someone had

broken into. He told his father that he had seen a man coming out of the yard with a bag on his shoulder and described the man as "a big white guy." According to information given the police by the defendant at the time of his booking on 16 May 1985, the defendant was six feet four inches tall and weighed 220 pounds.

After arriving at work, Cone told his co-worker Clarence Bricky that someone had broken into a house and that he had come so close to Cone that Cone could shake his hand. Cone described the man's dress and stated that "he was about one big white dude."

Cone also described the incident to his co-worker John D. McCoy. He told McCoy that the man he saw "was a real big white guy; and that he had a plastic bag of some kind on his shoulder."

After the bodies of the victims were found, numerous items were discovered missing from the Eastburn home. The missing items included Mrs. Eastburn's wallet which had contained a twenty-four hour bank card, a metal lockbox which had contained numerous papers including the code for the use of the twenty-four hour bank card, bath towels and bed linens. An empty box of *Glad Bag* plastic trash bags was found on the clothes dryer in the home.

The missing twenty-four hour bank card belonging to Mrs. Eastburn was used twice after Mrs. Eastburn was last seen alive. The first occasion was on the night of Friday, 10 May 1985. The second occasion was on the morning of Saturday, 11 May 1985. One hundred and fifty dollars in cash was obtained from a bank teller machine on each such occasion. The card was not used after the defendant's arrest on 15 May 1985.

Bank records reflected that on one of these occasions Mrs. Lucille Cook used her bank card at the same location within four minutes after Mrs. Eastburn's card had been used there. Mrs. Cook testified that, as she arrived at the teller machine, she observed an unusually tall man in his twenties with blonde hair. He entered a light colored two-door automobile. Mrs. Cook observed him for at least a minute from distances of from six to twenty feet. She identified the defendant as looking like the person she saw at the bank. When asked whether she was positive the defendant was the man she saw, she responded: "If it's not

him, it looks like someone just like him." "It looks like the man I saw at the bank." "If it's not, it looks just like him . . . ."

Other evidence indicated that the defendant drove a white Chevrolet Chevette. Various witnesses testified that they had seen that white Chevette or one like it near the home of the victims late on the evening of Thursday, 9 May 1985. One witness testified that she saw a tall, white, light haired, well-built man walking up the street at about the time she noticed the car. The defendant had been observed sitting in his white Chevette across from the victims' home between 11:15 a.m. and noon on Thursday, 9 May 1985, watching the house.

Other evidence for the State tended to show that about 9:30 a.m. on Saturday, 11 May 1985, the defendant began systematically burning something in a barrel in his backyard. The defendant would pour a flammable liquid in the barrel, and fire would blaze five to six feet high. The defendant at times stirred the fire with a stick. He was seen pouring such flammable liquids and stirring the fire all during that day. Garbage service was regularly provided to the area on a weekly basis, and the defendant's neighbors had never seen him engage in such burning activities previously. When the burned debris in the barrel was examined, several types of material were found and identified as follows: jersey knit material, such as that used in tee shirts; terry cloth material, such as that used in washcloths and towels; woven materials, such as that found in sheets or linens; and various unidentifiable small portions of papers.

The State introduced an abundance of evidence in addition to that I have mentioned. Further discussion of such evidence would serve little purpose here, however, given the issue the majority finds determinative on appeal. I turn, therefore, to the issue of the propriety of the admission into evidence of the slides and photographs to illustrate the testimony of the witnesses—the issue the majority finds determinative.

The trial court conducted a hearing upon the defendant's motion to exclude the photographs of the crime scene and of the bodies at the autopsies. After reviewing the photographs and slides, the trial court excluded sixty-four of the ninety-nine photographs the State intended to offer. The trial court concluded that thirty-five of the photographs could be received in evidence

at trial; nine taken at the scene of the crimes and twenty-six taken during the autopsies.

When considering first the nine photographs taken at the crime scene, it must be borne in mind that the bodies of three mutilated victims were involved in this case, and that they were found in two different rooms in the home. I believe the trial court did not abuse its discretion in allowing three photographs of the body of each victim at the scene to be introduced to illustrate the testimony, because I do not agree with the majority's conclusion that the trial court's ruling in this regard was so manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision. When, as here, such photographs are properly authenticated, they may be used to show "the condition of the body when found, its location when found and the surrounding scene at the time the body was found [and] are not rendered incompetent by the portrayal of the gruesome events which the witness testifies they accurately portray." *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E. 2d 784, 789 (1982).

With regard to the twenty-six photographs of the bodies taken during the autopsies, it must again be borne in mind that three bodies were involved and that each bore many wounds in many locations on more than one side of the body. Additionally, each victim's throat had been cut in a manner commonly described as "from ear to ear" and, in at least one instance, almost decapitating the body. The fact that numerous photographs and slides were required to properly illustrate the testimony of the forensic pathologists concerning all of these wounds was a fact established by the murderer when he chose to kill and mutilate the woman and her young children and not the responsibility of the trial court, the State, or the witnesses.

It is true that at least two of the autopsy photographs portrayed matters already portrayed in two others. Although we have cautioned against the use of an excessive number of photographs depicting the same scene, I do not find the repetition here sufficient to justify awarding the defendant a new trial on the ground that the trial court abused its discretion.

The majority is also concerned by the use of the reproduction of the photographs on slides which were then projected in the courtroom on a screen three feet and ten inches in height by five

feet and six inches in width. It must be remembered that this screen was placed on the opposite side of the courtroom from the jury in order that all jurors might see it as the witnesses testified. Had it been much smaller, one may doubt whether all of the jurors would have been able to see the slides used to illustrate the testimony.

The majority also seems to express concern that the photographs and slides were in color and to be of the opinion that this has something to do with the decision whether to admit or exclude such photographs. I do not agree. The victims lived and most certainly died "in color," and I see nothing unfair or untoward about demonstrating the crime scene and the victims' bodies in that light.

In my view, the photographs and slides complained of were properly introduced as illustrative testimony — both for determining the guilt or innocence of the defendant and for sentencing purposes — as each was relevant to illustrate the condition of the bodies or the crime scene. Additionally, they tended to establish the manner and means by which the killings were carried out, including the force used, the dealing of lethal blows after the victims were helpless, the nature and number of the wounds, and the extreme brutality of all of the killings. Therefore, they were relevant as to the elements of first-degree murder as well as to illustrate the "nature of the crime" for sentencing purposes.

The slides and photographs were gory and gruesome and may even have been "macabre" as stated by the majority. However, that fact as well as the number of photographs required to illustrate testimony concerning *all* the wounds inflicted on the victims was the result of the nature of the crimes committed by the murderer who left the bodies of the woman and small children in such a mutilated condition — facts which the State was entitled to establish.

The trial court reviewed all of the photographs taken by the State and excluded most of them. I cannot agree with the majority that the trial court's careful decision to allow the remainder of the photographs to be introduced into evidence was manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision. Therefore, I cannot agree with the majority that the trial court abused its discretion in admitting

the photographs and slides. Accordingly, I dissent from the majority's decision to award the defendant a new trial.

The decision of the majority awarding the defendant a new trial makes it unnecessary to consider or decide the issues raised in the defendant's assignments of error relating to the sentencing proceeding conducted in this case. Without reaching such issues, it suffices here to say that some of them, at least, are substantial in nature. As always, the trial court will be required to exercise extreme caution in conducting the sentencing procedure at a new trial and in instructing the jury with regard to sentencing.

Justice MEYER joins in this dissenting opinion.