STATE OF NORTH CAROLINA v. DANIEL PETERSON

No. 491A93

(Filed 29 July 1994)

**1. Evidence and Witnesses § 1009 (NCI4th)— unavailable witness—statements to officer—guarantees of trustworthiness—admissibility under residual hearsay exception**

The trial court did not err by finding that hearsay statements made to an officer by an unavailable witness who refused to tes-

tify possessed sufficient guarantees of trustworthiness to be constitutionally admissible in a murder trial under Rule 804(b)(5) where the evidence tended to show that the witness described events about which only she could have known; the witness had no motivation other than to speak the truth; the only information supplied by the officer to the witness was the number of the trailer where the events occurred; the witness made statements against her penal interest wherein she referred to her use of illegal drugs and participation in prostitution; the witness was incarcerated for much of the time between the interview and the trial and never attempted to recant her statement during a two-year period; and the statement to the officer was recorded. N.C.G.S. § 8C-1, Rule 804(a)(2).

**Am Jur 2d, Evidence §§ 701 et seq.**

**Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.**

2. **Evidence and Witnesses § 1694 (NCI4th)— photographs of victim's body and crime scene—repetition of testimony near jury**

The trial court did not err in allowing the admission of photographs depicting a murder victim's body and items found at the crime scene and in allowing the State's witnesses to testify about the photographs from the witness stand and then to repeat their testimony near the jury where the photographs were not overly gruesome or gory; the photographs of the victim's body merely showed its position in the ditch where it was found and a single bullet wound in her head; the photographs of the trailer where the crime occurred showed the condition of the crime scene at the time law officers examined it; the number of photographs was not excessive; and the State's witnesses showed the photographs a second time in front of the jury merely to better illustrate their testimony at closer range.

**Am Jur 2d, Homicide §§ 417 et seq.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

3. **Evidence and Witnesses §§ 2793, 2983 (NCI4th)— cross-examination about conviction—actual amount of time to be served—possibility of parole—speculation—no plain error**

Any error by the trial court in a murder trial in permitting the State, without objection by defendant, to cross-examine two witnesses already sentenced for the victim's murder regarding the actual amount of time they would serve in prison did not constitute plain error since the jury's knowledge that the two witnesses might not serve their entire sentences for their involvement in the murder is not likely to have affected its verdict in light of the strong evidence of defendant's guilt, including testimony by an eyewitness that she saw defendant holding a gun to the victim's head just before she heard one gunshot.

**Am Jur 2d, Witnesses §§ 426 et seq., 569 et seq.**

4. **Homicide § 232 (NCI4th)— first-degree murder—sufficiency of evidence**

The trial court properly denied defendant's motion for a directed verdict at the close of the evidence in a first-degree murder trial where the State's evidence tended to show that defendant, the victim and two others were in a trailer on the night of 6 August; an eyewitness saw defendant holding a gun to the victim's head just before she heard one gunshot; the victim died from a gunshot wound to the head that occurred while the muzzle of the gun was in contact with the victim's scalp; blood found in the trailer was consistent with the victim's blood, and small, rounded luminal reactions at the trailer were consistent with the tips of crutches defendant was using; officers were dispatched to the scene at 1:17 p.m. on 7 August and discovered the victim's body later that afternoon; and defense witnesses testified that another person accidentally shot the victim around 10:00 or 10:30 a.m. on 7 August, and they went to move the body later on the night of 7 August and cleaned the trailer the next day.

**Am Jur 2d, Homicide §§ 425 et seq.**

5. **Trial § 526 (NCI4th)— first-degree murder verdict—refusal to set aside—no abuse of discretion**

The trial court did not err in the denial of defendant's motion to set aside the verdict of guilty of first-degree murder as being against the greater weight of the evidence where the jury's verdict

was consistent with substantial evidence regarding each element of first-degree murder and defendant being the perpetrator of that offense.

**Am Jur 2d, Trial § 1953.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Thompson, J., at the 5 August 1993 Criminal Session of Superior Court, Cumberland County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 11 April 1994.

*Michael F. Easley, Attorney General, by William P. Hart, Special Deputy Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried noncapitally on an indictment charging him with the first-degree murder of Charletta Covington. The jury returned a verdict finding defendant guilty on the theory of premeditation and deliberation, and he was sentenced to life imprisonment. Defendant assigns error to the admission of hearsay testimony, use of photographic evidence, questioning of witnesses about past convictions, and failure to grant motions for a directed verdict and to set aside the verdict as being against the greater weight of the evidence. We conclude that defendant received a fair trial free of prejudicial error.

The State's evidence tended to show that defendant came from New York City to North Carolina with Damon Chamberlain, Jeff Page, and Jerome Kelly, to sell cocaine in the Fayetteville area. One place from which they sold cocaine was a trailer located at lot #10, Thomas' Mobile Home Park.

Teresa Blackwell, a prostitute, testified that she went to the trailer on the night of 6 August 1991 to have sex in exchange for cocaine. Defendant, Chamberlain, and the victim, Charletta Covington, were in the trailer. While Blackwell was in the trailer, she observed defendant, who recently had been shot in the leg, using crutches. When Blackwell left the trailer just before midnight, defendant, Chamberlain, and Charletta Covington remained there. Blackwell saw the victim alive and well shortly before midnight. Blackwell also testified that defendant and his friends previously had accused Charletta Covington of stealing a package of drugs from them.

STATE v. PETERSON

[337 N.C. 384 (1994)]

Michelle Hopper, another prostitute, stated that on the night of 6 August 1991 she saw Chamberlain chasing Charletta Covington out the front door and around the trailer. According to Hopper, Chamberlain grabbed the victim's hair and threw her to the ground. Defendant then came out of the back door of the trailer. Hopper heard him say "Charletta, you stole my f——— package. I'm going to be the one to end it." Chamberlain then jerked Covington up and threw her towards defendant. Defendant had a gun and motioned towards the back door of the trailer. As they moved towards the back door, Chamberlain was holding the victim by the hair and defendant had a gun to the back of her head. Immediately after that, Hopper heard one gunshot.

On 7 August 1991 at 1:17 p.m., Deputy John Smith of the Cumberland County Sheriff's Department was dispatched to Thomas' Mobile Home Park regarding a possible deceased person in a ditch. Deputy Smith found the body of Charletta Covington in a ditch in the woods near the trailer at lot #10. He also found a trash bag in the ditch with the body.

Dr. Deborah Radisch, an expert in forensic pathology, testified that on 8 August 1991 she performed an autopsy on the victim. She further stated that the cause of death was a single gunshot wound to the head. Based on the scalp tearing around the wound and the existence of powder residue within the wound track, Dr. Radisch determined that the muzzle of the gun was in contact with the victim's scalp when it was fired. Dr. Radisch removed small fragments of lead and jacketing material from inside the wound track.

Deputies from the Homicide Section of the Cumberland County Sheriff's Department conducted a search of the trailer. They found garbage bags on the kitchen counter which were of the same texture and color as the one found in the ditch with the body. The deputies located cleaning materials in the kitchen and cleanser in the living room. They discovered a visible amount of blood in the living room, human tissue on the stereo, and a bullet hole with a projectile embedded in it in the window frame behind the sofa. On the kitchen table, they found .38 caliber hollow-point ammunition, which was consistent with the projectile in the window frame and with the bullet fragment removed from the victim's body. Sergeant Donald Smith testified that the deputies later recovered an Amtrak train ticket for New York City in Damon Chamberlain's name which indicated a departure time of 1:49 p.m. on 7 August 1991.

Lucy Milks, a forensic serologist and a Special Agent with the SBI, conducted chemical tests in the trailer using luminal and phenolphthalein. She obtained reactions indicating the presence of blood in the living room, kitchen, hallway, bedroom, and bathroom. Samples of blood from the trailer were consistent with the victim's blood. Milks observed swirling patterns which indicated cleaning or mopping blood. Milks also noticed several small, rounded reactions one-inch in diameter. She testified that these reactions were consistent with the tips of crutches defendant was using in August 1991. Milks testified that the luminal reactions indicated that the crutch tips had picked up blood and transferred it to the floor.

Defendant presented three witnesses. Damon Chamberlain testified that he was from New York and was serving a twenty-year sentence in North Carolina after a plea bargain in which he pled guilty to the second-degree murder of Charletta Covington. He testified that Charletta Covington was not in the trailer on the night of 6 August 1991. Chamberlain testified that on the morning of 7 August 1991, he was in the trailer with Pam Jordan, Jerome Kelly, and the victim. Chamberlain testified that he saw a .41 caliber magnum revolver near the couch; to prevent someone from stealing it, he picked it up and saw that it was cocked and had bullets in it. When he tried to put the trigger back, the gun accidently discharged and the bullet went past Kelly and hit Charletta Covington, who was sitting on the couch six to seven feet away, in the head.

Chamberlain testified that they panicked, ran out, and went to Hardee's. He stated that after leaving Hardee's they went to another trailer on Patton Street to get defendant and then to a nearby hotel. Chamberlain testified that later in the evening of 7 August 1991, he and Kelly went back to the trailer to move the body to the ditch in the woods. The next day, he and Kelly purchased cleaning materials and went to the trailer with defendant to clean it. Defendant was in the trailer but did not help them. Chamberlain testified that they then left for New York City.

Jerome Kelly testified that he was from New York and was serving a three-year sentence pursuant to a plea bargain in which he pled guilty to accessory-after-the-fact to the murder of Charletta Covington. He testified that Charletta Covington was not in the trailer on the night of 6 August 1991. He stated that around 10:00 or 10:30 a.m. on 7 August 1991, he was in the trailer with Chamberlain, Pam Jordan, and the victim. He saw Chamberlain with the gun and heard it discharge

and saw the victim with her head back on the couch. Kelly testified that later on the night of 7 August 1991, around 11:00 p.m., he went with Chamberlain back to the trailer to move the body. They went back to the trailer on 8 August 1991 in the middle of the day to clean it. He did not remember whether defendant was with them. Kelly testified that after cleaning the trailer, they took the train to New York.

Defendant testified that he came to North Carolina to sell drugs. He further testified that he was not in the trailer on the night of 6 August 1991. He saw the victim in the early morning hours of 7 August 1991 while he was in the trailer on Patton Street. The victim was looking for Chamberlain. Around noon on 7 August 1991, Chamberlain and Kelly came to him and told him Chamberlain had killed Charletta Covington. Defendant testified that he was not present when Kelly and Chamberlain moved the body, but that he was there when they were cleaning. Defendant admitted, however, that when he gave a statement to New York City Police he stated that he had never been back to the trailer.

The State presented rebuttal evidence through the testimony of Sergeant Smith. Smith testified that a .41 magnum revolver cannot be loaded or unloaded with the hammer in the cocked position because the gun's chamber cannot be opened. He further testified that the Sheriff's Department had not found any .41 magnum ammunition or weapon at the trailer. Smith stated that the deputies had not found blood stains or any evidence of blood on or near the couch at the trailer.

[1] In his first assignment of error, defendant contends the trial court erred in admitting under Rule 804(b)(5) the hearsay testimony of Michelle Hopper, which was in the form of an out-of-court statement given to an officer. Defendant argues that the circumstances surrounding this hearsay evidence do not have sufficient guarantees of trustworthiness to warrant introduction under Rule 804(b)(5), and therefore admission of the statement violated his state and federal rights to confrontation of witnesses, based on the Sixth Amendment of the United States Constitution and Article I, Section 23 of the North Carolina Constitution. We disagree.

The residual hearsay exception for instances in which the declarant is unavailable, Rule 804(b)(5), provides:

(b) Hearsay exceptions.-The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . .

(5) Other Exceptions.-A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered that any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rule 804(b)(5) (1992).

In *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), this Court articulated the guidelines for admission of hearsay testimony under Rule 804(b)(5). The trial court must first find that the declarant is unavailable. *Triplett*, 316 N.C. at 8, 340 S.E.2d at 740. A declarant is unavailable if he "[p]ersists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." N.C.G.S. § 8C-1, Rule 804(a)(2) (1992). Here, the trial court found that Hopper knew that she was under subpoena to testify, knew that she would be held in contempt of court if she did not, and still refused to testify. Based on these findings, it concluded that Hopper was unavailable. It then proceeded with the six-step inquiry set forth in *Triplett* to determine the admissibility of Hopper's testimony. The court must determine:

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and

(6) Whether "the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*State v. Ali,* 329 N.C. 394, 408, 407 S.E.2d 183, 191-92 (1991) (citing *Triplett,* 316 N.C. at 9, 340 S.E.2d at 741). In conducting this analysis,

[t]he trial court is required to make both findings of fact and conclusions of law on the issues of trustworthiness and probativeness, because they embody the two-prong constitutional test for the admission of hearsay under the confrontation clause, i.e., necessity and trustworthiness. On the other four issues, the trial court must make conclusions of law and give its analysis. We will find reversible error only if the findings are not supported by competent evidence, or if the law was erroneously applied.

*State v. Deanes,* 323 N.C. 508, 515, 374 S.E.2d 249, 255 (1988), *cert. denied,* 490 U.S. 1101, 104 L. Ed. 2d 1009 (1989).

Defendant complains that the trial court's findings of fact regarding the trustworthiness of Hopper's statement are not supported by competent evidence, and that the admission of the hearsay evidence was erroneous as a matter of law. The United States Supreme Court has stated that because an evidentiary rule such as 804(b)(5) is a "residual" hearsay exception, rather than a "firmly rooted" one, it does not inherently possess indicia of reliability. *Idaho v. Wright,* 497 U.S. 805, 817, 111 L. Ed. 2d 638, 653-54 (1990). However, a statement which falls under the residual hearsay exception can meet Confrontation Clause standards if it is supported by particularized guarantees of trustworthiness based on the totality of the circumstances surrounding the making of the statement. *Id.* at 817, 820, 111 L. Ed. 2d at 653, 655-56.

In *Triplett* this Court articulated factors the trial court should consider to determine whether a hearsay statement possesses the required guarantees of trustworthiness. The trial court should examine, among other factors:

(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted

the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination. . . . Also pertinent . . . are factors such as the nature and character of the statement and the relationship of the parties.

*Triplett,* 316 N.C. at 10-11, 340 S.E.2d at 742. Here, the trial court found that Hopper's statement was taken under circumstances that assured her personal knowledge of the events; the substance of the statement contained statements against Hopper's penal interest; Hopper had no motivation other than to speak the truth; and over a two-year period Hopper never recanted her statement.

These findings of fact are well supported by the evidence. Hopper testified to events about which only she could have known; Sergeant Smith testified that the only information he had supplied to Hopper was the number of the trailer. Hopper made statements in her testimony against her penal interest wherein she referred to her use of illegal drugs and participation in prostitution. This Court has stated that the extent to which a statement resembles a declaration against penal interest is one factor to consider in determining the trustworthiness of that statement. *State v. Nichols,* 321 N.C. 616, 625, 365 S.E.2d 561, 567 (1988). Additionally, Hopper was incarcerated for much of the time between the interview and the trial and never attempted to recant her statement during that two-year period. Finally, Hopper's statement was made to a law enforcement officer and was recorded. This evidence supports the trial court's findings of fact and conclusion of law that the hearsay testimony of Hopper possessed sufficient guarantees of trustworthiness to be constitutionally admissible under Rule 804(b)(5). Defendant's assignment of error therefore is overruled.

[2] Defendant next contends the trial court committed plain error in allowing the admission of, and testimony regarding, the State's photographic exhibits depicting the victim's body and items found at the scene of the crime. He argues that these exhibits were unduly inflammatory, and complains that the trial court improperly allowed the cumulative introduction of an excessive number of photographs. He also argues that it improperly permitted the State's witnesses to testify about the photographs from the witness stand and then walk in front of the jury and repeat their testimony.

Photographs "showing the condition of the body when found, its location . . ., and the surrounding scene at the time . . . are not rendered incompetent by the portrayal of the gruesome events which the

witness testifies they accurately portray." *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E.2d 784, 789 (1982). Repetitive photographs may be introduced, even if they are revolting, as long as they are used for illustrative purposes and are not aimed solely at prejudicing or arousing the passions of the jury. *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). Photographs may be excluded, however, if their probative value is outweighed by their prejudicial impact. *Id.* at 284, 372 S.E.2d at 526. Whether particular photographic evidence is more probative than prejudicial is a matter for the trial court's sound discretion. *Id.* at 285, 372 S.E.2d at 527. Factors a court may consider include what the photographs depict, the level of detail, the manner of presentation, and the scope of accompanying testimony. *Id.* at 285, 372 S.E.2d at 527.

The photographs about which defendant complains were not overly gruesome or gory. The photographs of Charletta Covington's body merely showed her position in the ditch and a single bullet wound in her head. The photographs of the trailer showed the condition of the crime scene at the time law enforcement officers examined it. The number of photographs was not excessive. The State's witnesses showed the photographs a second time in front of the jury merely to better illustrate their testimony at a closer range.

If defendant had objected to the admission of, and testimony surrounding, the photographs in question, the trial court would have properly overruled the objections. The admission of the photographs was not error, and thus clearly not plain error. This assignment is overruled.

[3] Defendant contends the trial court committed plain error in permitting the State to cross-examine two witnesses already sentenced for Charletta Covington's murder concerning their arrests, punishment and possibility of parole. This contention, too, is without merit.

For the purpose of attacking their credibility, witnesses may be cross-examined regarding convictions for crimes for which the punishment is confinement of more than sixty days. N.C.G.S. § 8C-1, Rule 609(a) (1992). The scope of inquiry is restricted to the name of the crime, the time and place of conviction, and the punishment imposed. *State v. Lynch*, 334 N.C. 402, 410, 432 S.E.2d 349, 353 (1993); *State v. Finch*, 293 N.C. 132, 141, 235 S.E.2d 819, 825 (1977). Questions regarding the possibility of parole are outside the scope of permissible inquiry. Additionally, the issue of when a prisoner will be granted parole is speculative and beyond the knowledge of the witness. *State*

*v. Rutherford,* 70 N.C. App. 674, 681, 320 S.E.2d 916, 921 (1984), *disc. rev. denied,* 313 N.C. 335, 327 S.E.2d 897 (1985). Here, the trial court permitted the State to question Chamberlain and Kelly regarding the actual amount of time they would serve in the prison system.

Because defendant did not object, however, this Court must apply a plain-error analysis. Under the plain-error standard, the appellate court should not grant a new trial unless it is convinced that absent the alleged error, the jury probably would have reached a different verdict. *State v. Black,* 308 N.C. 736, 741, 303 S.E.2d 804, 807 (1983). The plain error rule is

> always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial,' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*Id.* at 740-41, 303 S.E.2d at 806-07 (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir.), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

The inquiry by the State into the actual amount of time Chamberlain and Kelly would spend in jail did not deny defendant a fair trial. The State's evidence effectively showed that on the night of 6 August 1991 defendant, Chamberlain, Blackwell and the victim were in the trailer. An eyewitness saw defendant holding a gun to the victim's head just before she heard one gunshot. Dr. Radisch testified that the gunshot wound occurred while the muzzle of the gun was in contact with the victim's scalp. Agent Milks testified that blood found at the trailer was consistent with the victim's blood. She also testified that small, rounded luminal reactions at the trailer were consistent with the tips of defendant's crutches. Law enforcement officers were dispatched to the scene at 1:17 p.m. on 7 August 1991 and discovered the victim's body later that afternoon. Defense witnesses, however, testified that Damon Chamberlain accidently shot Charletta Covington around 10:00 or 10:30 a.m. on 7 August 1991, they went to

move the body later on the night of 7 August 1991, and cleaned the trailer the next day.

Viewing the evidence as a whole, the jury's knowledge that Chamberlain and Kelly might not serve their entire sentences for their involvement in the murder is not likely to have affected its verdict. Defendant thus has not met the plain-error standard. This assignment of error is without merit.

**[4]** Defendant asserts as his final assignment of error that the trial court erred in denying both of his motions for a directed verdict and his motion to set aside the verdict as being against the greater weight of the evidence. We disagree.

At the close of the State's evidence, defendant made a motion for a directed verdict of not guilty, which the trial court denied. Following this denial, defendant introduced evidence and therefore waived any argument on appeal regarding that motion. N.C. R. App. P. 10(b)(3); *see State v. Bruce*, 315 N.C. 273, 280, 337 S.E.2d 510, 515 (1985).

At the close of all the evidence, defendant again moved for a directed verdict of not guilty. The trial court also denied this motion. In general, the credibility of witnesses and the sufficiency of evidence are questions for the jury to evaluate in light of the court's instructions. *State v. Smith*, 268 N.C. 659, 662, 151 S.E.2d 596, 598 (1966). The trial court should deny a motion for a directed verdict if there is substantial evidence of each element of the offense charged and of the defendant being the perpetrator of the crime. *State v. McDonald*, 312 N.C. 264, 275, 321 S.E.2d 849, 855 (1984). Substantial evidence is the amount of relevant evidence a reasonable person might accept as sufficient to support a conclusion. *State v. Myers*, 309 N.C. 78, 83, 305 S.E.2d 506, 509 (1983). In making its determination, the trial court must consider the evidence in the light most favorable to the State, giving the State every reasonable inference and resolving any discrepancies in its favor. *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

First-degree murder is the unlawful killing of a human being with malice, premeditation and deliberation. N.C.G.S. § 14-17 (1993); *see State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1984). The evidence, as reviewed hereinabove and in the light most favorable to the State, including the properly admitted hearsay testimony of Michelle Hopper, was substantial as to each element of the offense of first-

degree murder and the defendant being the perpetrator. Therefore, the trial court properly denied defendant's motion for a directed verdict at the close of all the evidence.

[5] After the jury returned the guilty verdict, defendant made a motion to set aside the verdict as being against the greater weight of the evidence. The trial court denied this motion. The denial of a motion to set aside the verdict as being against the weight of the evidence is within the discretion of the trial court and is reviewable on appeal under an abuse of discretion standard. *State v. Wilson,* 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985). Abuse of discretion occurs "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Hennis,* 323 N.C. at 285, 372 S.E.2d at 527. Here, the jury's verdict was consistent with substantial evidence regarding each element of first-degree murder and defendant being the perpetrator of the offense. The trial court thus did not abuse its discretion in refusing to set aside the verdict. Accordingly, this assignment of error is overruled.

NO ERROR.