An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1282

NORTH CAROLINA COURT OF APPEALS

Filed:  15 July 2014

STATE OF NORTH CAROLINA

v.

Haywood County
No. 10 CRS 53914; 53922

MICHAEL DAVID MORROW


Appeal by defendant from judgments entered 28 March 2013 by Judge Bradley B. Letts in Haywood County Superior Court.  Heard in the Court of Appeals 4 March 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Jess D. Mekeel, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Emily H. Davis, for Defendant.*


ERVIN, Judge.

Defendant Michael David Morrow appeals from judgments sentencing him to a term of life imprisonment without the possibility of parole and a consecutive term of eight to ten months imprisonment based upon his convictions for first degree murder and possession of a firearm in violation of a domestic violence protective order.  On appeal, Defendant contends that the trial court erred by permitting Sylvia Donahoe to testify

that Defendant was not impaired when she saw him on the evening of the events underlying the charges that had been lodged against Defendant. After careful consideration of Defendant's challenge to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

## A. Substantive Facts

Defendant and Amanda Smith Morrow were married on 5 December 2009. After the couple had lived together for a brief period of time, Ms. Morrow obtained a restraining order against Defendant in February 2010. After moving out of the marital residence, Defendant stayed in a cinder block structure located on his father's property. In spite of the fact that Defendant and Ms. Morrow lived separately from February 2010 through October 2010, the two of them continued to see each other. During this period, Ms. Morrow allowed the restraining order that she had obtained against Defendant to lapse. Although Ms. Morrow repeatedly asked Defendant to sign a separation agreement, she never actually gave such an agreement to Defendant for his signature.

On 15 October 2010, Defendant and Ms. Morrow planned to attend a high school football game. In the period of time

leading up to the game, the two of them exchanged dozens of text messages. After arriving at the stadium with her friend, Deanna "Dedy" Wayman, at 5:15 p.m., Ms. Morrow and Ms. Wayman "just sat and talked" until the game began at 7:30 p.m. At approximately 6:30 p.m., Defendant and Glenn Surrett purchased a pint of Crown Royal, with Defendant having consumed the entire bottle by the time the football game began. During the game, Defendant sat behind Ms. Morrow while accusing her of texting other men. Ms. Morrow denied Defendant's accusations.

Following the game, Defendant argued with Ms. Morrow at her car before returning to the location where Mr. Surrett; Mr. Surrett's sister, Ms. Donahoe; and Ms. Donahoe's children were waiting. Although Ms. Donahoe smelled alcohol on Mr. Surrett, she did not make the same observation about Defendant. According to Ms. Donahoe, Defendant, who appeared to be angry, was able to walk up a grassy hill without assistance. After taking Mr. Surrett home, Defendant drove to Ms. Morrow's residence.

In the meantime, Ms. Morrow had returned to her parents' house and asked them for money for use in obtaining a divorce. A few minutes after she left her parents' home at approximately 12:00 a.m., Ms. Morrow called her mother to tell her that, when she reached home, Defendant was blocking her driveway. However,

the call that Ms. Morrow had placed to her mother was disconnected before the completion of their conversation due to an apparent altercation with Defendant.

According to a statement that Defendant made to investigating officers, Defendant and Ms. Morrow began arguing after she reached home and discovered that Defendant was present. As the argument progressed, Defendant struck Ms. Morrow. Although Defendant began strangling Ms. Morrow, she eventually broke free and ran to a nearby bridge. After chasing Ms. Morrow to the bridge and struggling with her at that location, Defendant returned to his car for the purpose of leaving. As Ms. Morrow walked back towards her home, Defendant grabbed his gun and confronted her on the front porch of her neighbor, Robert Brown. After choking and shooting his wife, Defendant left her body lying on Mr. Brown's front porch. Although Mr. Brown heard screams and a gunshot during the night, he did not investigate the source of those noises. After assaulting Ms. Morrow, Defendant drove to his father's house, where he switched vehicles, and then to a Walmart, where he purchased Tylenol PM and Nyquil.

At approximately 12:45 a.m., deputies of the Haywood County Sheriff's Office responded to a 911 call that had been placed by Ms. Morrow's parents. Although the responding deputies saw that

Ms. Morrow's car had been pulled partially into her driveway, they did not see Defendant's vehicle and could not locate anyone else in the immediate area.[1]

At approximately 6:00 a.m., investigating officers arrived at the residence of Defendant's father. As they reached that location, the investigating officers observed that Defendant's vehicle was parked in front of the cinder block building in which he had been staying. After approaching the cinder block building, the officers announced their presence and knocked on the door for several minutes. As a result of the fact that Defendant did not respond, his father offered to kick in the door to the cinder block building for the purpose of allowing the investigating officers to enter.

Upon entering the cinder block building, the investigating officers found Defendant lying on a bed with a .32 revolver adjacent to his left hand. The revolver, which contained four bullets and one empty casing, was immediately seized by investigating officers. In response to an inquiry concerning Ms. Morrow's whereabouts, Defendant said that he "done what [he] done." As a result of the fact that he appeared to be impaired, although he did not smell of alcohol, the investigating officers

---

[1]A number of other officers believed that they had seen a vehicle that resembled the one that Defendant had been driving travelling in the opposite direction as they approached Ms. Morrow's residence.

had Defendant transported to the hospital. A blood sample taken from Defendant at the hospital tested positive for Tylenol PM and negative for alcohol.

At approximately 8:10 a.m., Ms. Morrow's body was discovered on Mr. Brown's porch. An examination of Ms. Morrow's body revealed the presence of blunt force injuries and lacerations and bruises to her face, neck, chest, left arm, and back; a fractured hyoid bone; and a gunshot wound to her right temple. Ms. Morrow died as the result of manual strangulation and the gunshot wound that she had sustained to her head. The gunshot wound to Ms. Morrow's head resulted from the impact of a bullet fired from the .32 revolver that had been seized from Defendant.

After Defendant was taken to the hospital, investigating officers searched the cinder block house and Defendant's vehicle. During the course of that search, investigating officers found a box of .32 shells, a Walmart bag containing Nyquil and Tylenol PM, and a domestic violence protective order that was in effect from 1 October 2010 through 16 September 2011, which had been obtained by Defendant's ex-wife, Lauren Burress, and which prohibited Defendant from possessing any firearms.

According to Dr. Wilkie Wilson, Jr., a neuropharmacologist, Defendant would have had a blood alcohol content of .12 at the time that he killed Ms. Morrow in the event that he had consumed a pint of Crown Royal at the time described by Mr. Surrett. In addition, Dr. George Corvin, an expert in forensic psychiatry, opined that personality pathologies, stress, and "acute alcohol intoxication"[2] would have diminished Defendant's ability "to act with reasoned contemplation" and to refrain from acting on impulse at the time of Ms. Morrow's murder. On the other hand, Dr. Nicole Wolfe, a forensic psychiatrist, testified that Defendant was malingering, that he did not suffer from a severe mental disease or defect, and that he was not "so intoxicated" as to be unable to make or carry out plans at the time that he killed Ms. Morrow.

## B. Procedural Facts

On 16 October 2010, a warrant for arrest charging Defendant with possessing a firearm in violation of a domestic violence protective order was issued. On 17 October 2010, a warrant for arrest charging Defendant with murdering Ms. Morrow was issued. On 16 December 2010, the Haywood County grand jury returned bills of indictment charging Defendant with possession of a

---

[2]The acute alcohol intoxication determination upon which Dr. Corvin's opinion was based stemmed, in part, from the .12 blood alcohol level determined by Dr. Wilson.

firearm in violation of a domestic violence protective order and murder. The charges against Defendant came on for trial before the trial court and a jury at the 4 March 2013 criminal session of the Haywood County Superior Court. On 28 March 2013, the jury returned verdicts convicting Defendant of possession of a firearm in violation of a domestic violence protective order and first degree murder. At the conclusion of the ensuing sentencing hearing, the trial court entered judgments sentencing Defendant to a term of life imprisonment without the possibility of parole based upon Defendant's conviction for first degree murder and to a consecutive term of eight to ten months imprisonment based upon Defendant's conviction for possession of a firearm in violation of a domestic violence protective order. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

In his sole challenge to the trial court's judgments, Defendant contends that the trial court erred by allowing Ms. Donahoe to testify that Defendant did not appear to be impaired when she saw him. More specifically, Defendant contends that the State failed to lay a sufficient foundation to support the admission of this testimony given Ms. Donahoe's concession that she had not been sufficiently close to Defendant to determine

whether there was an odor of alcohol about him and given that the additional information available to Ms. Donahoe did not suffice to provide her with an adequate basis for expressing an opinion concerning Defendant's level of sobriety. Defendant is not entitled to relief from the trial court's judgments on the basis of this argument.

## A. Standard of Review

Although both parties appear to agree that Defendant's challenge to the trial court's judgments is subject to plain error review, their agreement to that effect rests upon a misunderstanding about the effect of the lodging of a general, rather than a specific, objection. The testimony upon which Defendant's challenge to the trial court's judgments rests was given in response to a prosecutorial question posed to Ms. Donahoe inquiring if, "[a]t any time[,] did [Defendant] seem like he was impaired to you?" After the trial court overruled Defendant's objection, which did not include any reference to a specific basis for excluding the challenged testimony, Ms. Donahoe responded in the negative on the grounds that, "when I was ever around him, he was always by himself" and "didn't talk much." As a result, Defendant lodged a general, rather than a specific, objection to the admission of Ms. Donahoe's answer to the prosecutor's question.

According to well-established North Carolina law, "a 'general objection, if overruled, is no good, unless, on the face of the evidence, there is no purpose whatsoever for which it could have been admissible[,]'" while "'[a] specific objection, if overruled, will be effective only to the extent of the grounds specified.'" *State v. Ward*, 301 N.C. 469, 477, 272 S.E.2d 84, 89 (1980) (quoting 1 *Stansbury's North Carolina Evidence* § 26 (Brandis Rev. 1973)). In light of that basic principle, Defendant is entitled to appellate relief from the trial court's decision to overrule his objection to the question that elicited the challenged testimony in the event that there was no purpose for which Ms. Donahoe's answer to that question could have been admitted into evidence. Moreover, given that the essential argument advanced in Defendant's brief rests upon the assertion that the challenged portion of Ms. Donahoe's testimony constituted inadmissible lay opinion testimony and given that there is no purpose for which inadequately supported lay opinion testimony would be admissible, Defendant's general objection to the prosecutor's question sufficed to preserve his challenge to the admission of Ms. Donahoe's testimony for appellate review.

"[W]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion." *State v. Washington*, 141

N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000), *disc. review denied*, 353 N.C. 396, 547 S.E.2d 427 (2001). An "[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Thus, the ultimate issue raised by Defendant's challenge to the trial court's judgments is whether the trial court abused its discretion by overruling Defendant's objection to the question that sought to elicit Ms. Donahoe's testimony concerning the extent of Defendant's impairment on the night of Ms. Morrow's murder.

### B. Admissibility of Ms. Donahoe's Testimony

> If the witness is not testifying as an expert his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C. Gen. Stat. Ann. § 8C-1, Rule 701. In light of that basic principle, "a lay person may give his opinion as to whether a person is intoxicated so long as that opinion is based on the witness's personal observation." *State v. Rich*, 351 N.C. 386, 398, 527 S.E.2d 299, 306 (2000). Thus, in order for the trial court to have properly admitted Ms. Donahoe's opinion concerning the extent, if any, to which Defendant was impaired on the night

of the murder, the record was required to have contained sufficient evidence to permit a determination that Ms. Donahoe had an adequate basis for expressing an opinion concerning that issue. *State v. Norman*, 213 N.C. App 114, 119-20, 711 S.E.2d 849, 854-55, *disc. review denied*, 365 N.C. 360, 718 S.E.2d 401 (2011).

The initial problem with Defendant's argument is that, when read in context, Ms. Donahoe does not appear to have actually expressed an opinion about the extent of Defendant's impairment. The specific question that the prosecutor posed to Ms. Donahoe allowed for the possibility that Ms. Donahoe did not have an opinion about the issue. In light of the fact that Ms. Donahoe explained her negative response to the prosecutor's question by stating that, "when I was ever around him, he was always by himself" and "didn't talk much;" the fact that Ms. Donahoe's statement makes little sense when treated as an explanation for an opinion about the extent of Defendant's impairment; and the fact that Ms. Donahoe's statement makes perfect sense as an explanation for the fact that she had no opinion concerning that issue, we are inclined to believe that, rather than expressing an opinion concerning the extent of Defendant's impairment, Ms. Donahoe was actually saying that she did not have an opinion concerning that subject. Assuming that Ms. Donahoe did not

express an opinion about the level of Defendant's impairment on the night of Ms. Morrow's murder, we are unable to see how the admission of the challenged portion of her testimony had any prejudicial effect. N.C. Gen. Stat. § 15A-1443(a) (providing that "[a] defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises").

Moreover, to the extent that the challenged portion of Ms. Donahoe's testimony does, in fact, embody the expression of an opinion concerning the level of Defendant's impairment, we believe that the trial court would not have abused its discretion by allowing the admission of that testimony. The undisputed record evidence reflects that Ms. Donahoe knew Defendant and had interacted with him in the past in connection with their joint involvement with a dance team. On the night of Ms. Morrow's murder, Ms. Donahoe observed Defendant walking in an unassisted manner up a grassy hill without slipping or falling. Although she had a brief conversation with Defendant, Ms. Donahoe did not indicate that his speech was slurred or that he spoke in an incoherent manner. Simply put, given the level of contact between Ms. Donahoe and Defendant on the night in

question, we are unable to say that the trial court abused its discretion by allowing Ms. Donahoe to express an opinion concerning the level of Defendant's impairment. As a result, Defendant is not entitled to relief from the trial court's judgments as the result of the admission of the challenged portion of Ms. Donahoe's testimony.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Judges MCGEE and STEELMAN concur.

Report per Rule 30(e).