MURPHY, Judge.
Respondent-mother, Erin[1] , appeals from an order terminating her parental rights to the juvenile, A.J.K. ("Audrey"). Erin argues the trial court erred in its determination that termination was in Audrey's best interests. After careful review, we affirm.
BACKGROUND
On 28 May 2016, the Iredell County Department of Social Services ("DSS") filed a petition alleging Audrey, a newborn, was an abused and neglected juvenile. DSS claimed it received a Child Protective Services ("CPS") report on 23 May 2016 after Erin tested positive for opiates at the time of Audrey's birth. DSS claimed Erin had been in Mary's House, a residential treatment facility, in April 2016 and tested positive for opiates shortly after her arrival. DSS further claimed Erin admitted to taking a portion of a Subutex pill she found in her grandmother's home prior to going into labor with Audrey. Audrey was born three weeks early at only 37 weeks gestation and displayed "indicators of drug exposure and [possible] withdrawal[,]" which resulted in a delayed discharge from the hospital. DSS further claimed in the petition that Erin and the father had a prior CPS history due to their first child ("Kaitlyn") ingesting an opiate and requiring emergency medical treatment. DSS claimed a petition to terminate Erin and the father's parental rights to Kaitlyn was pending due to the parents' failure to make progress on their case plans. DSS alleged Erin had several pending criminal charges and was currently on probation, while the father was incarcerated in Wilkes County on various charges.
DSS obtained non-secure custody of Audrey, and she was placed back with Erin pursuant to a safety plan whereby Audrey would be released to Erin provided that Erin: (1) return to Mary's House for further in-patient substance abuse treatment; (2) not leave the facility unsupervised; and (3) not take any opiate pain medication or use any illegal drugs. Audrey was subsequently adjudicated a neglected juvenile on 6 July 2016.
On 12 January 2017, Erin was discharged from Mary's House "due to dishonesty, having relationships that are not warranted until she has reached the senior level; and the continuance of smoking cigarettes." As a result, Audrey was removed from placement with Erin and placed in foster care. Following Audrey's removal, Erin continued to have issues with substance abuse. On 13 February 2017, Erin tested positive for cocaine on a drug screen requested by her probation officer; subsequently, on 5 May 2017, Erin overdosed on heroin and was hospitalized. The trial court ceased reunification efforts and changed the permanent plan for Audrey in an order entered 14 June 2017. The primary plan became adoption with a secondary plan of guardianship. On 28 June 2017, DSS filed a petition to terminate Erin's parental rights under N.C.G.S. § 7B-1111(a)(1), (2), (3), and (9).[2]
On 11 August 2017, Erin attended visitation with Audrey and was observed to be slurring her words, stumbling, and falling asleep. The visit was ended early due to Erin's behavior, and, after she returned to her vehicle, Erin was found unconscious and unresponsive in the driver's seat. Erin was taken to the hospital and diagnosed as having overdosed. Hospital records reflect that Erin admitted to snorting Suboxone and taking 2 to 3 pills of gabapentin. Her drug screen was positive for benzodiazepines and cocaine. After Erin began substance abuse treatment with Advene Health Group, she tested positive for: (1) opiates on 4 October 2017 and 1 November 2017; (2) cocaine on 28 December 2017; and (3) methamphetamine on 2 February 2018.
A hearing was held on the petition to terminate Erin's parental rights on 27 April 2018, and the trial court concluded that grounds existed to terminate Erin's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (9). On the same day, the trial court entered a separate dispositional order in which it concluded it was in Audrey's best interests that Erin's parental rights be terminated. Accordingly, the trial court terminated Erin's parental rights. Erin filed timely notice of appeal.
ANALYSIS
Erin argues on appeal that the trial court abused its discretion when it determined terminating her parental rights was in Audrey's best interests. We disagree.
After an adjudication that one or more grounds for terminating a parent's rights exist, the trial court must determine whether terminating parental rights is in the juvenile's best interests by considering the following criteria:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C.G.S. § 7B-1110(a) (2017). We review the trial court's termination for abuse of discretion. In re Anderson , 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." State v. Hennis, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).
In its dispositional order, the trial court made the following findings of fact concerning the factors set forth in N.C.G.S. § 7B-1110(a) :
2. The juvenile ... was ... 23 months old on the date of the disposition hearing.
3. The likelihood of the adoption of the juvenile is very likely. The juvenile is placed in a potential adoptive placement in the home of [Mr. and Mrs. Z.]. The juvenile has been in this placement since March of 2017, more than a year. The placement providers desire to adopt the juvenile. With the exception of the parental rights of the Respondent Parents, there appear to be no barriers to adoption. These placement providers have adopted another child. They are employed and have adequate space and resources and appropriate child care. They understand the nature of the permanent relationship and responsibilities created by adoption.
4. The permanent plan for the juvenile is adoption. Adoption has been the primary placement plan for the juvenile since the Permanency Planning Order filed June 14, 2017 and has remained the permanent plan in the most recent Permanency Planning Order filed January 22, 2018. Termination of parental rights of the Respondent Parents will aid in the accomplishment of the permanent plan for the juvenile.
....
6. There is a strong bond between the juvenile and the Respondent Mother. The Respondent Mother had the juvenile in her actual physical custody at Mary's House from the juvenile's birth until approximately January 12, 2017. During this period the Respondent Mother was very attentive to the juvenile and provided for her care when in the home and appropriate day care when the Respondent Mother was employed. Although Respondent Mother has missed some visits lately, when she visits (with the exception of a visit when she appeared impaired in August, 2017), Respondent mother is appropriate at the visits. Respondent Mother displays good parenting skills at the visits. She and the juvenile are affectionate toward each other and Respondent Mother has brought snacks and gifts and appears in tune with the juvenile's needs during the visits. The juvenile knows that Respondent Mother is her mother.
7. The quality of the relationship between the juvenile and the proposed adoptive parents is of high quality. The juvenile has a strong bond to both of the proposed adoptive parents. She appears very comfortable in their home and is also bonded to their four-year-old child. She appropriately seeks affection from [Mr. and Mrs. Z.] and looks to them to fulfill her needs. The Guardian ad Litem Volunteer has observed that the juvenile is shy around the volunteer and goes to [Mr. and Mrs. Z.] for comfort. [Mr. and Mrs. Z.] are affectionate toward the juvenile. The juvenile is up to date on her medical appointments and Iredell DSS has no concerns with her placement with [Mr. and Mrs. Z.].
8. Although the Respondent Mother has recently moved in with a very supportive and apparently appropriate boyfriend, the barrier to reunification with Respondent Mother and the primary risk to the juvenile's safety in the care of the Respondent Mother remains Respondent Mother's substance abuse and risk of relapse. On October 11, 2017, Respondent Mother was given a second chance warning by her substance abuse treatment provider, Advene Health Group, because of an October 4, 2017 drug screen that was positive for heroin. As recently as February 15, 2018, Respondent Mother screened positive for methamphetamine and as a result on March 1, 2018, she entered a final warning treatment contract with her substance abuse provider. She has lived in her current residence for three-four months and therefore the positive test on February 15, 2018 was after this recent transition.
Erin does not challenge any of the trial court's dispositional findings, and they are binding on appeal. Koufman v. Koufman , 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).
Erin first argues the trial court failed to give proper weight to the bond between her and Audrey when determining best interests. However, we have repeatedly stated that the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors. In re C.L.C. , 171 N.C. App. 438, 448, 615 S.E.2d 704, 709-10 (2005), aff'd in part, review dismissed in part , 360 N.C. 475, 628 S.E.2d 760 (2006). It is not our role to reweigh the evidence. In re P.A. , 241 N.C. App. 53, 57, 772 S.E.2d 240, 244 (2015).
In the instant case, the trial court made extensive findings regarding the strong bond between Erin and Audrey. The trial court also made the following findings relevant to the best interests of the child determination: (1) Audrey also had a strong bond with Mr. and Mrs. Z; (2) they were likely to adopt Audrey; and (3) termination of Erin's parental rights would aid in the permanent plan of adoption. The trial court additionally noted Erin's positive drug test occurring just over two months prior to the termination hearing and found that her continued drug use and risk of relapse constituted a "risk" to Audrey's safety. Based on these findings, we conclude the trial court appropriately considered the factors stated in N.C.G.S. § 7B-1110(a) when determining Audrey's best interests.
Erin next argues that, given the strong bond between her and Audrey and the existence of other dispositional options, termination of her parental rights in this case runs contrary to the State's policy expressed in the Juvenile Code to prevent "the unnecessary or inappropriate separation of juveniles from their parents." N.C.G.S. § 7B-100(4) (2017).
Although parents have a constitutionally protected interest in the care and custody of their children and should not be unnecessarily or inappropriately separated from their children, "the best interests of the juvenile are of paramount consideration by the court and ... when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time." N.C.G.S. § 7B-100(5) (2017) ; see also In re Montgomery , 311 N.C. 101, 109, 316 S.E.2d 246, 251 (1984) (emphasizing that "the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] that the best interest of the child is the polar star"). Moreover, the Juvenile Code provides "procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents" and "develop[s] a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family." N.C.G.S. § 7B-100(1), (2) (2017).
Given our determination that the trial court appropriately considered the framework set forth in N.C.G.S. § 7B-1110(a) for determining best interests, we conclude termination of Erin's parental rights does not run contrary to our State's policy expressed in the Juvenile Code. See In re L.M.T. , 367 N.C. 165, 167, 752 S.E.2d 453, 455 (2013) (stating that "[s]trict adherence to [ N.C.G.S. § 7B-507 ] ensures that the trial court fulfills the aspirations of the Juvenile Code by allowing our appellate courts to conduct a thorough review of the order.").
Finally, Erin argues the trial court acted under a misapprehension of law when terminating her parental rights. Erin correctly notes that "[a]n order terminating the parental rights completely and permanently terminates all rights and obligations of the parent to the juvenile and of the juvenile to the parent arising from the parental relationship." N.C.G.S. § 7B-1112 (2017). She appears to argue that, based on the trial court's conclusion of law in the dispositional order that termination "will not result in an unnecessary severance" of the relationships between her and the juvenile, the trial court did not understand the consequences of terminating her parental rights. However, despite the trial court's language concerning an "unnecessary severance," the court concluded that termination of Erin's parental rights was in the juvenile's best interests and, as such, was a necessary severance. Erin's argument is further undermined by the trial court's statement in the dispositional order that "all the rights and obligations of [Erin] to the Juvenile and of the said Juvenile to the Mother arising from the parental relationship [are] hereby ... fully and irrevocably terminated ." (emphasis added).
CONCLUSION
The trial court's ultimate conclusion that termination of Erin's parental rights was in Audrey's best interests was not an abuse of discretion, manifestly unsupported by reason. Accordingly, we affirm.
AFFIRMED.
Report per Rule 30(e).
Chief Judge McGEE and Judge HUNTER, JR. concur.

Pseudonyms are used to protect the identity of the juvenile and for ease of reading.

DSS also filed a petition to terminate the parental rights of Audrey's father. Audrey's father does not appeal the trial court's ultimate order terminating his parental rights, so we need not further discuss this petition and order.