IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-520

Filed 4 June 2025

Brunswick County, No. 20JA000128-090

IN THE MATTER OF: M.L.H.

Appeal by Respondent-Father from order entered 14 March 2024 by Judge Pauline Hankins in Brunswick County District Court. Heard in the Court of Appeals 14 January 2025.

> *Batch, Poore & Williams, PC, by Sydney J. Batch, for Respondent-Appellant-Father.*
>
> *Jane R. Thompson for Petitioner-Appellee Brunswick County Department of Social Services.*
>
> *Wake Forest University School of Law, by John J. Korzen, for Other-Appellees.*
>
> *Campbell University School of Law, by Robert C. Montgomery, for the Guardian ad Litem.*

CARPENTER, Judge.

Respondent-Father appeals from the trial court's 14 March 2024 permanency-planning order (the "Order") granting permanent guardianship of his son, M.L.H. ("Michael") to Michael's foster family (collectively, the "Sullivans").[1] Respondent-

---

[1] Pseudonyms are used to protect the identity of the juvenile and for ease of reading. *See* N.C. R. App. P. 42(b).

Father's appointed appellate counsel filed a no-merit brief pursuant to Rule 3.1(e) of the North Carolina Rules of Appellate Procedure. After careful review, we affirm.

## I. Factual & Procedural Background

Michael was born in September 2020 and lived with his biological mother, who is not a party to this appeal. On 8 September 2020, the Brunswick County Department of Social Services ("DSS") received a family assessment report alleging Michael was neglected, tested positive for THC at birth, and was a substance affected infant. The report also alleged Michael's mother had untreated substance abuse issues.

On 9 September 2020, a social worker responded to the report and met with Michael's family at their home. Michael and his mother were living in a home with several individuals, including Michael's maternal aunt, maternal aunt's boyfriend, boyfriend's brother, and the brothers' mother. When the social worker arrived, she observed Michael lying on a pull-out couch surrounded by several pillows, blankets, bottles, and bibs. The social worker identified this as an inappropriate sleeping environment that posed a risk to Michael's safety. During the visit, Michael's mother told the social worker that she used marijuana while pregnant with Michael, was currently using marijuana twice daily, and was not currently taking her medication for her mental health conditions. Michael's mother agreed, pursuant to a safety plan, that she would not use substances while caring for Michael and that Michael would

be provided a sober caregiver. Before leaving, the social worker provided Michael's mother with a pack-n-play and safe-sleeping recommendations for Michael.

On 29 September 2020, DSS received a second family assessment report regarding Michael, which alleged continued neglect, improper supervision, substance abuse, and an injurious environment. Specifically, the report alleged Michael's mother placed Michael in the same inappropriate sleeping environment observed during the initial visit, failed to respond to Michael's feeding cries at night, and placed Michael in a car seat during the night on more than one occasion. Following the report, the social worker responded to the home a second time. During this visit, Michael's mother, Michael's maternal aunt, and their respective boyfriends, all admitted to the allegations in the report.

On 30 September 2020, DSS filed a petition alleging Michael was a neglected and dependent juvenile. Although paternity had not yet been established, the petition listed an individual ("putative father") as Michael's father based on Michael's mother's belief regarding paternity. That same day, the trial court placed Michael in the custody of DSS, who temporarily placed Michael with the Sullivans.

On 12 November 2020, the trial court conducted an adjudication hearing. At the hearing, Michael's mother and putative father admitted that Michael tested positive for marijuana at birth, lacked proper care and supervision, lived in unstable housing, and was often placed in unsafe conditions. After DSS voluntarily dismissed the dependency allegation, the trial court entered an order adjudicating Michael as a

neglected juvenile. On 3 December 2020, the trial court conducted a disposition hearing where it ordered that Michael remain in DSS custody and continue living with the Sullivans. Additionally, the trial court ordered DSS to continue reunification efforts with Michael's mother and putative father.

On 20 January 2021, the trial court conducted a review hearing. Prior to the hearing, putative father participated in DNA testing which revealed he was not Michael's biological father. Consequently, the trial court removed putative father as a party and ordered that DSS continue reunification efforts with Michael's mother. After several permanency-planning hearings, Michael's mother relinquished her parental rights as to Michael on 12 October 2022.

On 10 January 2023, DSS filed a motion to establish paternity after Michael's mother named Respondent-Father as a potential father. The motion indicated that Respondent-Father was incarcerated in Illinois and unable to participate in DNA testing without a court order. On 2 February 2023, following a hearing on the matter, the trial court ordered that Respondent-Father participate in DNA testing. Respondent-Father complied, and the DNA testing indicated a 99.99% probability that Respondent-Father was Michael's biological father. Accordingly, on 6 July 2023, the trial court adjudicated Respondent-Father as Michael's biological father.

On 31 July 2023, a notice of hearing was mailed to Respondent-Father. On 16 August 2023, the trial court conducted the first permanency-planning hearing since Respondent-Father was found to be Michael's biological father. Respondent-Father

did not participate in the hearing, but his attorney was present and offered a proffer in that Respondent-Father was presently incarcerated. Respondent-Father's attorney informed the trial court that Respondent-Father was scheduled to be released to a halfway house on 22 August 2023 where he would remain for two months. Respondent-Father planned to live with his mother in Illinois upon his release from the halfway house.

The trial court entered a permanency-planning order on 11 October 2023, making several findings regarding Michael's foster placement with the Sullivans. Specifically, the trial court found that Michael had been living with Sullivans since he was twenty-nine days old and was "thriving." The trial court also found that the Sullivans were "the only home and family [Michael] knows." The trial court adopted a primary plan of reunification with Respondent-Father and a secondary plan of guardianship with the Sullivans.

On 11 September 2023, Respondent-Father executed an out-of-home services agreement with DSS that addressed mental health, employment, and housing. Then, on 26 September 2023, the trial court conducted a second permanency-planning hearing. Respondent-Father attended the hearing via Webex and testified. He informed the trial court that he had been released from incarceration and was living in a halfway house in Illinois as a condition of his parole, with his release contingent on his good behavior. The trial court entered a permanency-planning order on 30 November 2023, finding, again, that Michael was "thriving" with the Sullivans. The

trial court maintained the primary plan of reunification with Respondent-Father and secondary plan of guardianship with the Sullivans.

In December 2023, however, Respondent-Father voluntarily returned to incarceration rather than remain on parole. According to Respondent-Father, he chose to return to incarceration because his parole officer was "writing him up for the littlest things."

On 22 January 2024, the trial court conducted another permanency-planning hearing. Respondent-Father appeared via Webex and testified that he voluntarily returned to incarceration and would be released in July 2024. Respondent-Father further testified that upon his release from incarceration he would be living with his significant other and that he hoped to be reunified with Michael even though he had never met him.

On 14 March 2024, the trial court entered the Order finding Respondent-Father acted in a manner inconsistent with Michael's health and safety, failed to make any measurable progress toward his case plan or reunification, and voluntarily returned to incarceration at a time when it was critical for him to work on his case plan goals. The trial court further found that Respondent-Father demonstrated a disregard for Michael's best interest by voluntarily returning to incarceration rather than remaining in the halfway house where he could have made progress toward his case plan goals. The trial court found that reunification with Respondent-Father within the next six months was not possible and would clearly be unsuccessful due to

Respondent-Father's decision to return to incarceration until July 2024. Accordingly, the trial court ceased reunification efforts and awarded guardianship of Michael to the Sullivans. The trial court did, however, grant Respondent-Father telephone contact and supervised monthly visits with Michael upon Respondent-Father's release from incarceration. On 28 March 2024, Respondent-Father filed written notice of appeal.

## II.  Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. § 7B-1001(a)(4) (2023).

## III.  Analysis

Respondent-Father's appellate counsel filed a no-merit brief pursuant to Rule 3.1(e) of the North Carolina Rules of Appellate Procedure after concluding "the record contains no issues of merit on which to base an argument for relief." As required under Rule 3.1(e), counsel advised Respondent-Father of his right to file *pro se* written arguments on his own behalf with this Court and provided him with the documents necessary to do so. *See* N.C. R. App. P. 3.1(e). Respondent-Father has not submitted a written argument to this Court.

Under Rule 3.1(e), this Court conducts an independent review of the issues identified by counsel in a no-merit brief. *See In re L.E.M.*, 372 N.C. 396, 402, 831 S.E.2d 341, 345 (2019); N.C. R. App. P. 3.1(e). Respondent-Father's appellate counsel specified one issue for our independent review: whether the trial court abused its discretion by awarding guardianship of Michael to the Sullivans.

"This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007). "Findings of fact not challenged by [the] respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019). "We review a trial court's determination as to the best interest of the child for an abuse of discretion." *In re D.S.A.*, 181 N.C. App. 715, 720, 641 S.E.2d 18, 22 (2007). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re A.H.F.S.*, 375 N.C. 503, 513, 850 S.E.2d 308, 317 (2020) (citing *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

The longstanding rule that "incarceration, standing alone, is neither a sword nor a shield[,]" is applicable in the context of this case. *See In re K.N.*, 373 N.C. 274, 282, 837 S.E.2d 861, 867 (2020) (cleaned up); *In re E.B.*, ___ N.C. App. ___, 912 S.E.2d 884 (2024) (unpublished). In the same way a parent's incarceration, on its own, "cannot serve as clear, cogent, and convincing evidence of neglect," incarceration, on its own, cannot support the trial court's decision to eliminate reunification with a parent as a primary or secondary plan. *See In re K.N.*, 372 N.C. at 283, 837 S.E.2d at 867. The degree to which a parent's incarceration supports the trial court's

decision to cease reunification depends on the facts and circumstances of each case, including the length of the incarceration and, as is relevant here, whether it was undertaken voluntarily. *See id.* at 283, 837 S.E.2d at 867–68.

As a general rule, the trial court is permitted to cease reunification efforts following a permanency-planning hearing if it "makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B–906.2(b) (2023). To make such a determination, the trial court must make written findings concerning:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B–906.2(d) (2023); *see also In re D.C.*, 275 N.C. App. 26, 29–30, 852 S.E.2d 694, 697 (2020). The trial court exercises discretion when making written findings under section 7B–906.2(b) but is required to make written findings for the factors that demonstrate the degree of a parent's progress, or lack thereof, toward reunification. *In re L.L.*, 386 N.C. 706, 718–19, 909 S.E.2d 151, 161 (2024).

Here, the unchallenged findings support the trial court's decision to cease reunification efforts with Respondent-Father and grant guardianship of Michael to the Sullivans. In accordance with section 7B–906.2(b), the trial court found that continued reunification efforts with Respondent-Father would be "clearly futile and [] unsuccessful." *See* N.C. Gen. Stat. § 7B–906.2(b). To support this finding, the trial court made the required findings under section 7B–906.2(d) demonstrating Respondent-Father's lack of progress toward reunification. *See In re L.L.*, 386 N.C. at 718–19, 909 S.E.2d at 161.

Specifically, the trial court found that Respondent-Father made inadequate progress toward his case plan within a reasonable period of time and failed to actively participate in the plan or cooperate with the Guardian ad Litem. *See* N.C. Gen. Stat. § 7B-906.2(d)(1)–(2). The trial court also found that Respondent-Father was not consistently available to the Guardian ad Litem, despite his availability to the trial court. *See* N.C. Gen. Stat. § 7B-906.2(d)(3). Further, the trial court found that Respondent-Father acted in a manner inconsistent with Michael's health and safety, highlighting Respondent-Father's choice to return to incarceration at a time when it was critical for him to work on his case plan goals. *See* N.C. Gen. Stat. § 7B-906.2(d)(4); N.C. Gen. Stat. § 7B-906.2(b). Finally, because placement with Respondent-Father was not possible at the time of the hearing or within the following six months due to his incarceration, the trial court found that continued reunification

efforts were inconsistent with Michael's need for a safe and permanent home.  *See* N.C. Gen. Stat. § 7B-906.1(g); N.C. Gen. Stat. § 7B-906.2(b).

Moreover, the trial court's reliance on Respondent-Father's incarceration in the Order was warranted under these circumstances.  *See In re K.N.*, 373 N.C. at 282, 837 S.E.2d at 867; *In re E.B.*, ___ N.C. App. ___, 912 S.E.2d 884 (2024) (unpublished).  Respondent-Father's choice to return to incarceration demonstrated a lack of genuine commitment to reunification and was the ultimate manifestation of neglect.  *See In re G.B.*, 377 N.C. 106, 115, 856 S.E.2d 510, 517 (2021) (explaining the father's choices while incarcerated hindered his ability to comply with his case plan resulting in the father "construct[ing] the very barriers to the achievement of his case plan goals about which now he complains").  Similarly, here, Respondent-Father created the very obstacles that possibly prevented him from achieving his case plan goals.

Thus, because the trial court made the required findings and properly considered Respondent-Father's voluntary incarceration, it did not abuse its discretion by ceasing reunification efforts.  *See In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58.

Likewise, the trial court did not abuse its discretion by awarding guardianship of Michael to the Sullivans.  *See In re D.S.A.*, 181 N.C. App. at 720, 641 S.E.2d at 22.  The unchallenged findings establish Michael has been living with the Sullivans since he was twenty-nine days old and has never met Respondent-Father.  Further, the findings establish that Michael is "thriving and meeting all developmental

milestones" and that the Sullivans' home is the only home Michael has ever known. Finally, the Sullivans testified they understand the legal significance of guardianship, have adequate resources to continue providing proper care for Michael, and are committed to facilitating a relationship between Michael and his biological family. *See* N.C. Gen. Stat § 7B-906.1(j) (2023) (providing that the trial court shall verify that the person being appointed guardian understands the legal significance of the appointment and will have adequate resources).

Thus, the trial court's decision to award guardianship of Michael to the Sullivans based on Michael's best interest was not "so arbitrary that it could not have been the result of a reasoned decision." *See In re A.H.F.S.*, 375 N.C. at 513, 850 S.E.2d at 317. Therefore, the trial court did not abuse its discretion by awarding guardianship of Michael to the Sullivans.

## IV. Conclusion

After careful consideration of the issue presented in the no-merit brief and following our independent review of the record, we conclude the trial court made the required findings and did not abuse its discretion by ceasing reunification efforts with Respondent-Father and awarding guardianship to the Sullivans. Accordingly, we affirm the Order.

AFFIRMED.

Judges STROUD and GRIFFIN concur.