An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-570

Filed 4 June 2025

Buncombe County, No. 19JA000165-100

IN THE MATTER OF: M.S.

Appeal by Respondent-Mother from Orders entered 7 November 2023 and 6 March 2024 by Judge Susan M. Dotson-Smith in Buncombe County District Court. Heard in the Court of Appeals 12 February 2025.

*Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender Jacky L. Brammer, for Respondent-Appellant Mother.*

*Jack Densmore for Petitioner-Appellee Buncombe County Department of Health and Human Services.*

*Michelle FormyDuval Lynch for Guardian ad litem.*

HAMPSON, Judge.

**Factual and Procedural Background**

Respondent-Mother appeals from the trial court's Adjudication Order entered 7 November 2023 adjudicating Mia[1] a neglected and dependent juvenile and from the Initial Disposition Order entered 6 March 2024 determining it was in the best interests of the minor child to remain in the custody of the Buncombe County Department of Health and Human Services (DHHS). The Record before us tends to reflect the following:

Mia was born to Respondent-Father[2] and Respondent-Mother on 3 March 2011. Respondent-Father obtained sole custody of Mia in October 2011. Respondent-Mother did not maintain contact with Mia.

On 20 February 2019, DHHS received a report concerning a domestic disturbance involving Respondent-Father and Mia's stepmother, which took place while Mia and her two siblings[3] were in the home. The report also alleged Mia's father had sexually abused Mia and her siblings. A second report was received the following day, further alleging domestic violence in the home and that Respondent-Father was sexually abusing Mia and her older sister.

Following substantiation of these allegations, DHHS filed a petition alleging Mia was a neglected juvenile on 21 June 2019. On 30 July 2019, DHHS filed a second petition alleging Mia was an abused and neglected juvenile and requesting non-

---

[1] A pseudonym agreed upon by the parties.
[2] Respondent-Father is not party to this appeal.
[3] Mia has two half-sisters.

secure custody. The same day, the trial court entered an order granting non-secure custody of Mia to DHHS. Mia was placed in a kinship placement with Miranda and Matthew McKenna.

In its Initial Permanency Planning and Review Order entered 8 July 2020, the trial court established a primary plan of reunification and a secondary plan of guardianship. After subsequent permanency planning hearings on 3 and 4 September 2020, Mia's primary plan was changed to guardianship and secondary plan was changed to reunification.

After hearings on 26 and 27 January 2021, the McKennas were granted legal guardianship of Mia. In its Subsequent Permanency and Planning Review Order entered 9 June 2021, the trial court ordered Respondent-Mother "shall have no contact other than letters, cards, and gifts, until the minor child is ready and until it is therapeutically recommended; and, if the minor child is willing and it is recommended by the therapist, the respondent mother can be present during the minor sibling visitation, supervised by Matthew and/or Miranda McKenna or by another person they approve to supervise." The trial court further ordered Respondent-Mother would be permitted to have unsupervised visitation only when Mia was ready, when it was therapeutically recommended, and when contact had been modified by the trial court.

In its Subsequent Permanency Planning and Review Order entered 8 September 2021, the trial court ordered the same restrictions on Respondent-

Mother's visitation. The trial court also ordered "no further reviews shall be scheduled; however, any party shall be permitted to bring this matter before this Court for review at any time by the filing of a motion[,]" all prior orders remained in full force and effect, and retained jurisdiction over the matter. At some point after these proceedings, Respondent-Mother moved to Indiana.

In the spring of 2023, Mia's guardians decided to move to Florida. Mia did not want to move to Florida with them because she "wanted to stay in the area to be near her friends and stay in her school." On 25 March 2023, Miranda McKenna emailed Respondent-Mother and explained they were moving to Florida and hoped Mia could go live with her, stating: "hopefully you have all your stuff completed so she can live with you. I am leaving the week of April 24th so this will need to happen quick." Mia's guardians did not prepare any other arrangements for her care and were apparently unaware Respondent-Mother was no longer living in North Carolina.

On 30 March 2023, DHHS learned of Mia's guardians' intent to move to Florida without Mia. Mia's guardians left her with DHHS on or about 20 April 2023—less than one month later. On 20 April 2023, DHHS filed a Petition alleging Mia was a neglected and dependent juvenile. The Petition also alleged "respondent biological parents are not placement options, due to prior orders of this court, and no other appropriate placement options are known to the Department." That same day, DHHS was granted temporary non-secure custody of Mia.

In its First Appearance Order entered 30 May 2023 and Order on Nonsecure Custody entered 19 July 2023, the trial court concluded "placement of the minor child in the home of the respondent mother or respondent father would be contrary to the juvenile's health and safety at this time, as their contact was previously restricted as a result of abuse and neglect." The trial court also ordered DHHS to submit an Interstate Compact on the Placement of Children (ICPC) home study request for Respondent-Mother.

After a hearing on 31 August 2023, the trial court entered an Adjudication Judgment and Interim Dispositional Order adjudicating Mia neglected on the basis her "parent, guardian, custodian, or caretaker has abandoned the juvenile" and dependent on the basis her "parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." Disposition hearings were held on 13 October 2023 and 28 November 2023. On 6 March 2024, the trial court entered an Initial Disposition Order in which it concluded it was in Mia's best interest to remain in DHHS custody. The trial court concluded DHHS had made reasonable efforts to prevent Mia's placement with DHHS, including custody staffing and exploring potential placements. The trial court dissolved the McKennas' guardianship rights to Mia. The trial court ordered Respondent-Mother to submit to a psychological evaluation and that she have no contact with Mia other than letters, cards, and gifts until further order of the trial court. Respondent-Mother timely filed Notice of Appeal on 3 April 2024.

## **Issues**

The issues on appeal are whether the trial court properly: (I) adjudicated the minor child a neglected and dependent juvenile; and (II) concluded it was in the minor child's best interest to remain in the custody of DHHS.

## **Analysis**

I.     Adjudication Order

Respondent-Mother challenges the trial court's adjudication of Mia as a neglected and dependent juvenile.  We review an adjudication under N.C. Gen. Stat. § 7B-807 to determine whether the trial court's findings of fact are supported by "clear and convincing competent evidence" and whether the trial court's findings, in turn, support its conclusions of law. *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citations omitted).  "Clear and convincing evidence is evidence which should fully convince." *In re J.A.G.*, 172 N.C. App. 708, 712, 617 S.E.2d 325, 329 (2005) (citation and quotation marks omitted).  "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007) (citation omitted), *aff'd on other grounds*, 362 N.C. 446, 665 S.E.2d 54 (2008). Erroneous findings, however, will not undermine an adjudication that is otherwise supported by proper findings. *See In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006) (citation omitted).  "The conclusion that a juvenile is abused, neglected, or

dependent is reviewed *de novo.*" *In re V.B.*, 239 N.C. App. 340, 341, 768 S.E.2d 867, 868 (2015) (citation omitted).

A. *Challenged Findings*

Respondent-Mother challenges the trial court's adjudicatory Findings 20, 21, 22, 31, 33, 35, 36, 38, 41, and 42:

> 20. The respondent mother chose not to pursue reunification during the last case. The respondent mother intended to take the case back to Court. The respondent mother did not complete a psychological evaluation prior to moving. The respondent mother learned, on March 25, 2023, that the McKennas were moving. The respondent mother has an 11 year old, and a 6 year old, with her current husband. The respondent mother believes that the minor child should have been placed with her. The respondent mother is aware of everything that has happened, and she is dedicated to getting the minor child's needs met. She last saw the minor child in December of 2019. The respondent mother was aware that the prior Court order prevented placement of the minor child with her; but believed the child should have been placed with her anyways.
>
> 21. The respondent father stipulated that the allegations in the Juvenile Petition, as modified and read into the record, are true and correct, and he stipulated that the Court could find these allegations as facts by clear and convincing evidence and, based upon this stipulation, that the Court could conclude as a matter of law that the minor child is a neglected and dependent child. The respondent father stated that he understood the consequences of his stipulation, that he had received adequate advice regarding this matter from his attorney, that no one had forced him to make that stipulation, and that he is satisfied with the services of his attorney. The respondent father's stipulation is knowing and voluntary.
>
> 22. The guardian ad litem, on behalf of the minor child, agreed that it is in the best interest of the minor child for the Court to find as facts the allegations in the petition as agreed upon by the

parties. Furthermore, the guardian ad litem stipulated that it is in the best interest of the minor child for the Court to accept the agreement of the parties.

. . . .

31. The Department filed juvenile petitions on June 21, 2019, and subsequently on July 30, 2019, alleging that the minor child was an abused and neglected juvenile (please see 19 JA 165). The minor child was adjudicated abused and neglected on or about March 10, 2020 . . . . The respondent mother was found by the Court to have mental health diagnoses for anxiety disorder, bi-polar disorder, and PTSD. The Court also found that the respondent mother stated she was not currently prescribed any medication by any medical doctor, and that the bipolar disorder diagnosis was a misdiagnosis. The respondent mother was ordered to submit to a psychological evaluation if she desired to reunify with the minor child.

. . . .

33. On or about September 3 and 4, 2020, the primary plan for the minor child was changed to guardianship. On or about January 26 and 27, 2021, guardianship was granted to the McKenna's. The Court found, among other things, that the respondent father was unwilling to engage in reunification efforts with the Department, the respondent mother had failed to engage in domestic violence services, and that it was unlikely that the minor child could reunify with either parent within the next 6 months.

. . . .

35. In the current assessment, the legal guardians confirmed their intention to re-locate to Florida because Matthew McKenna has found a better job there. The legal guardians stated that the minor child has made it clear that she did not want to go, and that they had no intention of forcing her to relocate with them. They reported no intention of signing approvals for the minor child to be placed prior to their departure and indicated they would not engage in visitation with the minor child from Florida should any

potential placement require that. Their only stated plan for the minor child was to enter foster care.

36. The minor child confirmed that she did not want to relocate to Florida with the legal guardians, because she wants to stay here with her friends. She accepted that she would enter foster care as a result. She stated her understanding that she might not be able to be placed here in Asheville, once she entered foster care, and understood that it was possible that her dog could not be placed with her. Despite these logistical concerns, the minor child continued to reiterate her intention not to go to Florida with her legal guardians. She has indicated that she does not want to be placed with Danielle, who has placement of the respondent father's two other children.

. . . .

38. On April 17, 2023, the respondent mother confirmed that she is currently "staying in Indiana". She confirmed that she has not engaged in a psychological evaluation, as ordered by the Court, and that she has not seen the minor child since 2019.

. . . .

41. The respondent legal guardians have failed to engage in planning for the placement of the minor child upon their relocation to the State of Florida and have been disinclined to require the minor child to accompany them. They have abrogated any responsibility to ensure the minor child is properly housed before they relocate, as specified above, and have abandoned the minor child to foster care. The respondent biological parents are not placement options, due to prior orders of this court, and no other appropriate placement options are known to the Department. The Department has no option but to request non-secure custody of the minor child so that she can be safely placed.

42. Based upon the above findings of fact as found by the Court, and by clear, cogent, and convincing evidence, the minor child is a neglected and dependent child, pursuant to N.C.G.S. §§ 7B-101(9) and (15), in that the juvenile's parent, guardian, custodian, or caretaker has abandoned the juvenile, and in that the

juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement.

As to Findings 21 and 22, Respondent-Mother argues Respondent-Father and the Guardian ad litem did not make any such stipulations. As to Finding 33, Respondent-Mother contends it is not supported by clear and convincing evidence because she was not required to engage in domestic violence services, there was no evidence presented at the hearing about her engagement with domestic violence services, and there was evidence in the Record tending to show she voluntarily underwent domestic violence therapy. We agree these Findings are unsupported by the evidence in the Record and therefore disregard them in our assessment of the trial court's Conclusions.

Next, Respondent-Mother challenges Finding 31 to the extent it states or implies she has ongoing mental health issues or problems. In its 27 March 2020 Adjudication Order, the trial court found:

> The Respondent Mother . . . has prior diagnoses for anxiety disorder, Bipolar disorder, and Posttraumatic Stress Disorder. The Respondent Mother . . . stated she is not currently prescribed any medication by any medical doctor. The respondent mother states that the bipolar disorder was a misdiagnosis.

The trial court also ordered Respondent-Mother undergo a psychological examination:

> That the respondent mother shall submit to a psychological evaluation if she wants to reunify with the minor child.

In the Adjudication Order at bar, the trial court described the March 2020 proceedings, where Respondent-Mother "was found" to have numerous mental health diagnoses. Thus, Finding 31 is supported by the evidence because it accurately describes the findings in the 27 March 2020 Adjudication Order.

Relatedly, Respondent-Mother argues Finding 38 is unsupported by the evidence because the trial court's order she receive a psychological evaluation was dropped. At the 17 April 2023 adjudication hearing, Respondent-Mother testified she never completed a psychological evaluation—despite the trial court expressly ordering her to do so in the 27 March 2020 Adjudication Order and the 8 July 2020 Initial Permanency Planning Review Order. There is no evidence in the Record indicating this requirement was waived or removed. To the contrary, in each subsequent order entered after the trial court first ordered Respondent-Mother to receive a psychological evaluation, the trial court ordered: "all prior orders of the Court shall remain in full force and effect unless specifically modified by this order." Thus, the trial court's Finding that Respondent-Mother had not engaged in a psychological evaluation as previously ordered is supported by the evidence.

As to Finding 20, Respondent-Mother argues to the extent the Finding "is construed as an admission or concession that the trial court in 2023 had no authority to award [her] custody of Mia, it is unsupported." At the hearing, Respondent-Mother testified a DHHS social worker had informed her Mia could not be placed with her because of a court order. She also acknowledged that, pursuant to the order, she was

not allowed unsupervised visitation with Mia until Mia was ready, it was therapeutically recommended, and until the order was modified by the trial court. Thus, Finding 20 is supported by the evidence.

As to Findings 35, 36, 41, and 42, Respondent-Mother contends they are unsupported by the evidence because she was an available placement option for Mia, Mia's guardians planned for Mia to be placed with her, and there was no plan for Mia to enter foster care.

The Record tends to show Miranda McKenna emailed Respondent-Mother on 25 March 2023 explaining the McKennas were moving "out of state[,]" and Mia did not want to go with them. Respondent-Mother testified this was the first time she had learned of Mia's guardians' intent to move. In the email, Miranda McKenna acknowledged she did not know whether Respondent-Mother "[had] all [her] stuff completed[,]" and that "this will need to happen quick." Indeed, less than a month passed between Miranda McKenna's email to Respondent-Mother and Mia re-entering into DHHS custody.

Additionally, Charlee Bowman, a supervisor at DHHS, testified at the adjudication hearing DHHS could not place Mia with Respondent-Mother due to the prior court order. Bowman further testified Mia's guardians had informed DHHS they were moving to Florida, had insisted Mia should remain in North Carolina, and had left Mia in the care of DHHS. Bowman also testified Mia's guardians generally failed to plan with DHHS for any other potential placements for Mia. This evidence

supports the trial court's Findings that Mia's guardians had "failed to engage in planning" for Mia's placement and that Respondent-Mother was not an available placement option because of its prior orders. Thus, Findings 35, 36, 41, and 42 are supported by the evidence.

B. *Dependency Adjudication*

Respondent-Mother challenges the trial court's Conclusion Mia was a dependent juvenile pursuant to N.C. Gen. Stat. § 7B-101(9). Under N.C. Gen. Stat. § 7B-101, a "dependent juvenile" is, in relevant part, one "in need of assistance or placement because . . . the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2023). "Thus, the trial court's findings regarding this ground 'must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements.' " *In re L.R.S.*, 237 N.C. App. 16, 19, 764 S.E.2d 908, 910 (2014) (citation omitted).

Respondent-Mother argues the trial court erred by adjudicating Mia dependent because she was available to provide for Mia's care and has never been found to be unfit as a parent. Specifically, Respondent-Mother contends the trial court did not consider whether she was available as a placement for Mia. In support of her argument, Respondent-Mother points to the trial court's instruction regarding preparation of the Adjudication Order:

[Trial Court]: So when you are preparing this order, I think that you need to be very clear from my perspective that there's a lot I don't need about where mom is and where dad is and what's going on. Because the legal guardians abrogated their responsibilities and left a 12-year-old in North Carolina while there was a court order that said neither parent could come in and immediately sweep them up and take care of 'em and while there was a court order that had parents who were not available.

Contrary to Respondent-Mother's assertion, the trial court did not state it "did not need to consider" whether Respondent-Mother was available as a placement option. Rather, the trial court's statement, considered in full, tends to show it *had* considered Respondent-Mother's availability—ultimately concluding Respondent-Mother was not a viable placement option because "there was a court order that said neither parent could come in and . . . take care of [Mia]".

Respondent-Mother further argues she was a placement option for Mia because the trial court found "Mia's therapist thought Mia was not at risk of harm from being with [Respondent-Mother]" and her ICPC home study endorsed her as a placement option for Mia.

First, we disagree with Respondent-Mother's characterization of the trial court's Finding as to Devona Finley's—Mia's therapist—testimony. The trial court did not find Mia was not at risk of harm from being with Respondent-Mother. The trial court found specifically that Finley had indicated "there are no concerns with the minor child *having contact* with the respondent mother." (emphasis added). Moreover, in that same Finding, the trial court also found Finley indicated placing

Mia with Respondent-Mother "would have been a challenge[,]" "[s]taying overnight with the respondent mother, and/or placement with the respondent mother, was never a clinical recommendation[,]" and "if a transition into the respondent mother's care was going to happen, it would need to go slowly[.]"

As to the ICPC home study, we agree with Respondent-Mother it may support a conclusion she is an appropriate placement for Mia; however, there is ample evidence supporting the opposite conclusion—including the prior court order prohibiting Respondent-Mother from having contact with Mia until therapeutically recommended—and testimony from Finley that Mia would need more time before it could be therapeutically recommended she is placed with Respondent-Mother. The trial court's Finding that Respondent-Mother was not a placement option for Mia is supported by competent evidence and thus binding on appeal, even if there may be evidence to the contrary. *See In re T.H.T.*, 185 N.C. App. at 343, 648 S.E.2d at 523 (citation omitted).

Respondent-Mother also argues the Juvenile Code dictates she should have been given custody of Mia. Respondent-Mother contends, under N.C. Gen. Stat. § 7B-300, the "first step" DHHS must take when there are allegations a juvenile is dependent is to "contact the child's parent(s) to offer services to the parent." *See* N.C. Gen. Stat. § 7B-300 (2023) (ordering the director of the department of social services in each county of the State to "establish protective services for juveniles alleged to be abused, neglected, or dependent."). Next, citing N.C. Gen. Stat. §§ 7B-302(c) and 7B-

503(a), Respondent-Mother contends if the parent accepts the "services," the parent should be given custody of the minor child and no petition should be filed.

Under N.C. Gen. Stat. § 7B-302(c),

> [i]f the assessment [made pursuant to a report of abuse, neglect, or dependency] indicates that abuse, neglect, or dependency has occurred, the director shall decide whether immediate removal of the juvenile or any other juveniles in the home is necessary for their protection. If immediate removal does not seem necessary, the director shall immediately provide or arrange for protective services. If the parent, guardian, custodian, or caretaker refuses to accept the protective services provided or arranged by the director, the director shall sign a petition seeking to invoke the jurisdiction of the court for the protection of the juvenile or juveniles.

Section 7B-503(a) provides that "[w]hen a request is made for nonsecure custody, the court shall first consider release of the juvenile to the juvenile's parent, relative, guardian, custodian, or other responsible adult." N.C. Gen. Stat. § 7B-503(a) (2023).

There is no evidence DHHS' or the trial court's actions ran afoul of Sections 7B-302(c) or 7B-503(a). The Record tends to show DHHS offered Mia's guardians protective services when it learned her guardians intended to leave North Carolina without her. Indeed, DHHS sought to keep Mia in her guardians' care, but her guardians refused after Mia had indicated she did not want to leave her friends and school in North Carolina and move to Florida. Thus, DHHS' actions complied with the requirements of Section 7B-302(c). Moreover, as explained, the trial court considered whether Mia could be placed with Respondent-Mother and found she could not be because of its prior orders, even though the trial court could have ordered

DHHS to provide services to Respondent-Mother. Thus, the trial court's actions complied with the requirements of Section 7B-503(a).

Repeatedly throughout her brief, Respondent-Mother rejects the premise that the trial court's prior orders prevent her from having placement or custody of Mia. Indeed, Respondent-Mother argues there is an "unnecessary preoccupation with prior court orders and [the court-ordered psychological evaluation]". Respondent-Mother contends the burden is on DHHS to prove she was not an appropriate placement for Mia. We agree and further conclude DHHS met its burden of proving Respondent-Mother was not an appropriate placement option.

As explained at length, the trial court found Respondent-Mother had not completed a psychological evaluation, despite having ordered her to do so. Further, the Record shows Respondent-Mother had been ordered not to have contact with Mia outside of cards, gifts, and letters until therapeutically recommended and ordered by the trial court; the Record tends to show no such recommendation had been made at the time of the adjudication hearing, no subsequent order reversing or modifying the trial court's order was ever entered, nor did Respondent-Mother request modification of the order at any time. This evidence is competent to support the trial court's Finding Respondent-Mother was not a placement option for Mia.

Moreover, the trial court concluded Mia was dependent because her "parent, *guardian*, or custodian is unable to provide for [her] care or supervision and lacks an appropriate alternative child care arrangement." (emphasis added). In concluding

Mia was a dependent juvenile, the trial court had to consider the circumstances surrounding Mia's *guardians*, not Respondent-Mother. *See In re A.L.L.*, 376 N.C. 99, 109, 852 S.E.2d 1, 8-9 (2020) ("[W]hen the child resides with a permanent legal guardian, the *parent's* ability to identify an alternative child care arrangement is extraneous to the concerns animating our Juvenile Code." (emphasis added) (footnote omitted)); *In re T.H.*, 232 N.C. App. 16, 27-28, 753 S.E.2d 207, 215 (2014) (considering legal custodian's ability to provide care or supervision in reviewing dependency adjudication).

Here, the trial court found Mia's guardians were moving out of North Carolina and "had no intention of forcing [Mia] to relocate with them." The trial court also found Mia's legal guardians had not arranged any alternative placement for her other than entering foster care. The trial court considered Respondent-Mother's availability as a placement and found she was not an appropriate option at that time because of its prior orders limiting her contact with Mia. The Record lacks evidence tending to show Mia's guardians proposed any other placement option for Mia or considered any other alternatives to leaving Mia behind in North Carolina.

Thus, the trial court's Findings are supported by the evidence. Therefore, the trial court's Findings support its Conclusion Mia's guardians were unable to provide for her care and lacked an appropriate alternative child care arrangement. Consequently, the trial court did not err in adjudicating Mia a dependent juvenile under N.C. Gen. Stat. § 7B-101(9).

C. *Neglect Adjudication*

Respondent-Mother also challenges the trial court's Conclusion Mia was a neglected juvenile pursuant to N.C. Gen. Stat. § 7B-101(15). A neglected juvenile is defined, in pertinent part, as one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; [or] [h]as abandoned the juvenile[.]" N.C. Gen. Stat. § 7B-101(15)(a), (b) (2023).

Respondent-Mother contends "neglect adjudications of any kind require that a child be at risk of harm from the circumstances." However, both cases cited by Respondent-Mother in support of this proposition concern an adjudication of neglect on the basis the juvenile's parent or guardian "does not provide proper care, supervision, or discipline" or "creates or allows to be created a living environment that is injurious to the juvenile's welfare." *See In re D.S.*, 286 N.C. App. 1, 15, 879 S.E.2d 335, 345 (2022); *In re G.C.*, 384 N.C. 62, 64, 884 S.E.2d 658, 660 (2023). Here, by contrast, Mia was adjudicated neglected on the basis she had been abandoned. "Abandonment has been defined as [willful] neglect and refusal to perform the natural and legal obligations of parental care and support. It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and [willfully] neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *In re Humphrey*, 156 N.C. App. 533, 540, 577 S.E.2d 421, 427 (2003) (citation omitted).

The Record tends to show Mia's guardians intended to move out of North Carolina without Mia simply because Mia did not want to go with them. Outside of a single email to Respondent-Mother, the Record is void of any other evidence Mia's guardians prepared any alternative placement for Mia, despite knowing Mia might not be able to be placed with Respondent-Mother. The Record instead tends to show Mia's guardians physically returned Mia to DHHS. Thus, the trial court's Findings are supported by the evidence. Therefore, the trial court's Findings support its Conclusion Mia was an abandoned minor. Consequently, the trial court did not err in adjudicating Mia a neglected juvenile.

II.   Disposition Order

Respondent-Mother contends the trial court erred in determining DHHS made reasonable efforts to avoid Mia's placement with DHHS and that it was in Mia's best interest to remain in the custody of DHHS. In so arguing, Respondent-Mother challenges both the trial court's Findings of Fact and Conclusions of Law.

"The trial court's dispositional findings of fact are reviewed under a competent evidence standard." *In re K.N.K.*, 374 N.C. 50, 57, 839 S.E.2d 735, 740 (2020) (citations omitted); *see also Stephens v. Stephens*, 213 N.C. App. 495, 503, 715 S.E.2d 168, 174 (2011) (" 'As long as there is competent evidence to support the trial court's findings, its determination as to the child's best interests cannot be upset absent a manifest abuse of discretion.' " (quoting *Metz v. Metz*, 138 N.C. App. 538, 541, 530 S.E.2d 79, 81 (2000))). "The [trial] court's assessment of a juvenile's best interest at

the dispositional stage is reviewed only for abuse of discretion." *In re C.S.*, 380 N.C. 709, 712, 869 S.E.2d 650, 653 (2022) (citation and quotation marks omitted) (alteration in original). " 'Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *In re C.J.H.*, 240 N.C. App. 489, 492-93, 772 S.E.2d 82, 86 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

A. *Reasonable Efforts*

Respondent-Mother argues the Order "must be reversed" because DHHS failed to make reasonable efforts toward reunifying her with Mia and challenges the trial court's Finding DHHS made reasonable efforts to prevent Mia from entering its custody as unsupported by the evidence. DHHS argues it was not required to make efforts toward Mia's reunification with Respondent-Mother once guardianship—the primary permanency plan established in the 2019 proceedings—was achieved.

At the permanency planning stage, which follows adjudication and disposition, the trial court generally must adopt concurrent permanent plans for the juvenile. *See* N.C. Gen. Stat. § 7B-906.2(b) (2023). Once a permanent plan is established, DHHS must make reasonable efforts toward achieving that plan:

> At any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. . . . Unless permanence has been achieved, the court shall order the county department of social services to make efforts toward finalizing the primary and secondary permanent plans and may specify efforts that are reasonable to timely achieve permanence for the juvenile.

*Id.* "Only when reunification is eliminated from the permanent plan is the department of social services relieved from undertaking reasonable efforts to reunify the parent and child." *In re T.W.*, 250 N.C. App. 68, 73, 796 S.E.2d 792, 795-96 (2016) (citing N.C. Gen. Stat. § 906.2(c) (2015)); *see also* N.C. Gen. Stat. § 7B-906.2(a1) (2023) ("Concurrent planning shall continue until a permanent plan is or has been achieved.").

In the prior proceedings, the trial court adopted a primary permanency plan of guardianship and a secondary permanency plan of reunification. The McKennas were granted guardianship of Mia on 12 February 2021. Thus, a permanent plan was achieved in those proceedings. *See In re M.A.C.*, 286 N.C. App. 158, 878 S.E.2d 681, 2022 WL 10218584, at *5 (2022) (unpublished) ("Thus, by establishing guardianship as a permanent plan and granting guardianship of the children to the paternal aunt and uncle, the 9 November order achieved a permanent plan in accordance with § 7B-906.2(a1) and (b)."). Consequently, DHHS was "relieved from undertaking reasonable efforts to reunify the parent and child." *In re D.C.*, 275 N.C. App. at 30, 852 S.E.2d at 697.

Here, a new petition was filed. The trial court was not obligated to make findings regarding DHHS' efforts toward reunifying Mia with Respondent-Mother because a permanent plan in these proceedings had not yet been established; the proceedings were only at the dispositional stage. *See* N.C. Gen. Stat. § 7B-906.1(a)

(2023) ("The court shall conduct a review or permanency planning hearing within 90 days from the date of the initial dispositional hearing held pursuant to G.S. 7B-901."). Thus, DHHS was not obligated to make efforts toward reunifying Mia with Respondent-Mother and the trial court did not err by not making any such findings.

In the proceedings at bar, the trial court was required to find whether DHHS made reasonable efforts to *prevent Mia's placement with DHHS*. *See id.* § 7B-903(a3) (2023) (A dispositional order "placing the juvenile in out-of-home care shall contain specific findings as to whether the department has made reasonable efforts to prevent the need for placement of the juvenile."). In the Initial Disposition Order, the trial court found DHHS made reasonable efforts to prevent Mia from returning to its custody, including "custody staffing" and "exploring potential relative/kinship/out of home placements." The trial court also found that in spite of these efforts, "no other reasonable means were available except custody with the Department." This Finding is supported by evidence in the Record, including a "Reasonable Efforts to Prevent Removal Checklist" in which DHHS indicated it had made efforts to explore custody staffing and potential kinship placements for Mia, as well as a spreadsheet of relatives DHHS had reached out to about potential placement for Mia. Additionally, Bowman testified "substantial time" was invested in seeing if it would be possible for Mia to remain in the care of her guardians.

Thus, DHHS was not required to make reasonable efforts to reunify Mia with Respondent-Mother, and the trial court's Finding that DHHS made reasonable efforts

to prevent Mia's placement with it is supported by the evidence. Therefore, the trial court did not err in making Findings only as to DHHS' efforts towards preventing Mia's placement with DHHS.

B. *Best Interests*

Lastly, Respondent-Mother contends the trial court abused its discretion in determining it was in Mia's best interest to remain in DHHS custody. Specifically, Respondent-Mother contends she should have been awarded custody of Mia, rather than DHHS.

The trial court concluded:

> 2. That it is in the best interest of the minor child that [the respondent mother will have no contact other than letters, cards, and gifts, until further order of the court].
>
> . . . .
>
> 4. That it is in the best interest of the minor child that she remains in the custody of the Buncombe County Department of Health and Human Services, with placement in the Department's discretion to provide or arrange for foster care or other placement, and with the authority to arrange for, provide, or consent to routine medical and dental care or treatment; emergency medical, surgical, psychiatric, psychological, or mental health care or treatment; and testing and evaluation in exigent circumstances for the minor child.

Respondent-Mother argues the trial court did not "have any legitimate reason to find placement of Mia with [her] was not in Mia's best interests or to deny all visitation." Respondent-Mother contends "the complete lack of consideration of reunification as a plan" was reversible error. As explained, however, the primary permanency plan

established in the prior proceedings had been achieved. Thus, concurrent planning ceased. *See* N.C. Gen. Stat. § 7B-906.2(a1) (2023). Nor was the trial court obligated to hold a permanency planning hearing *immediately* after the dispositional hearing. *See id.* § 7B-906.1(a) (2023). Therefore, the trial court did not abuse its discretion by not establishing permanent plans at the initial disposition hearing.

Respondent-Mother challenges several of the trial court's Findings in the Disposition Order "to the extent the court's findings appear to chastise [Respondent-Mother] or Mia's therapist for communicating and working together toward reunification or placement of Mia with" Respondent-Mother. Even disregarding these Findings, Respondent-Mother has not shown the trial court abused its discretion by concluding it was in Mia's best interest to remain in the custody of DHHS or by denying Respondent-Mother visitation with Mia. *See id.* § 7B-905.1(a) (2023) ("An order that . . . continues the juvenile's placement outside the home shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, *including no visitation*." (emphasis added)).

Here, the trial court found Mia had expressed she did not want to visit with Respondent-Mother, experienced anxiety related to building a relationship with Respondent-Mother, and wished to remain in North Carolina. Finley also testified contact with Respondent-Mother would be traumatizing for Mia. Respondent-Mother, herself, acknowledged it would be traumatizing for Mia to be placed with her and that she had not seen Mia in almost four years. Thus, the trial court's Findings

are supported by competent evidence. Therefore, the trial court did not abuse its discretion by Concluding it was in Mia's best interest that Respondent-Mother continue to have no contact with her other than letters, cards, and gifts and that custody of Mia should remain with DHHS. Consequently, the trial court did not err in entering its Initial Disposition Order.[4]

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm the trial court's 7 November 2023 Adjudication and 6 March 2024 Initial Disposition Orders.

AFFIRMED.

Judges TYSON and GRIFFIN concur.

Report per Rule 30(e).

---

[4] Although the trial court did not enter its Initial Disposition Order until 6 March 2024, the Order reflects the trial court had also begun permanency planning and review hearings in February 2024. Nothing in the trial court's Initial Disposition Order precludes Respondent-Mother from being granted visitation or even custody through this process under the appropriate circumstances.